**BOWLES v. AMMON et al.**

**Civ. A. No. 257.**

District Court, D. Nebraska,
Lincoln Division.

June 14, 1945.

Harry E. Witherell, of Chicago, Ill., for plaintiff.

Lloyd J. Marti (of Perry, VanPelt & Marti), of Lincoln, Neb., for defendants.

DELEHANT, District Judge.

Upon the basis of the defendants' alleged sales from and after November 6, 1943, of three types of gasoline engines of their own manufacture at unit prices in excess of the limitations prescribed in Maximum Price Regulation (hereafter abbreviated as M PR) 136, as amended,[1] the plaintiff prays for, (a) permanent injunctive relief against the continuance of the practice; and (b) a money judgment in a sum three times the aggregate amount of the overcharges.

No questions are presented respecting the constitutionality of the applicable statute or the general validity of the regulations. And the cooperation of counsel has eliminated by stipulation any question upon the unit volume and prices of sales actually in controversy. The primary question is whether MPR 136, as amended, governs the defendants in their marketing of the three engines involved, with the consequence that the maximum allowable sale prices are to be determined with October 1, 1941 as the base date. A negative answer to that question would eliminate all other

---

[1] The case is brought, and all regulations mentioned were issued, under authority of the Emergency Price Control Act of 1942 and amendments thereof, 50 U.S.C.A.Appendix § 901 et seq., including especially sections 921 to 926, both inclusive.

108

issues and require the dismissal of the action. An affirmative answer would introduce for solution certain further issues.

The engines are of two somewhat different types. One, known in the trade as the "Husky", is an air cooled unit; the other two are water cooled units of different sizes, both known in the trade under the name "Cub". All of them are within the general characterization of small gasoline engines.

The "Husky" is single cylinder, medium to high speed, vertical type gasoline engine, weighing approximately seventy-five pounds of two horsepower capacity. Being air cooled, it has no radiator. It rests on an iron base weighing only eight pounds, through which have been bored four bolt holes for fastening the engine in place, either temporarily or permanently, for use. When not so attached, it may readily and easily be carried from place to place by a normal man.

The "Cub" engines are larger, single cylinder, water cooled, medium to high speed, horizontal type gasoline engines, one of three horsepower, and the other of four horsepower, capacity. The larger of them weighs two hundred forty-five pounds and has overall dimensions of 25⅛ inches in length, 22⅜ inches in height, and 20 inches in width. The three horsepower engine has slightly smaller dimensions and weighs two hundred thirty-six pounds. Each "Cub" has an iron base weighing twenty-five pounds. It is impracticable manually to carry a "Cub" engine from place to place; but they are frequently, though not invariably, sold mounted on a small four wheel truck for convenient transportation; and without trucks may be moved on skids or by any available means of carriage. Upon the trial, the "Cub" engines were exhibited

with the truck equipment. The base of a "Cub" may also be bolted for the temporary or permanent localized use of the engine.

Whether those engines are included within the coverage of MPR 136, as amended, depends ultimately upon whether they are embraced in the following descriptive language quoted from Appendix "A", accompanying MPR 136, as amended:

"(a) *Prime Movers, etc.*

*"Gasoline* and Kerosene *engines for* marine, tractor, railway, and *stationary use* (not including portable outboard motors)".[2]

The defendants, at the outset, deny that the language may be construed to cover any of their three engines. Eliminating, as patently inapplicable, the reference to marine, tractor and railway uses, they argue that the specification of "gasoline engines for stationary use" clearly excludes all of their engines. This argument is based principally upon the contention that, in the common acceptation of the terms, theirs are "portable", as distinguished from "stationary" engines.

The history of the promulgation and effective date of MPR 136, as amended, should be noted briefly and summarily. Broadly construed it covers, and provides a maximum price structure for, "Machines and Parts, and Machinery Services". It occupies the regulatory field that was within the contemplated scope of an earlier regulation, known as MPR 136; but may not accurately be said to have succeeded to, or replaced, MPR 136; for MPR 136 never became effective or operative. MPR 136 was issued upon April 28, 1942 (7 F.R. 3198) and declared its effective date to be May 18, 1942. Two successive amendments (7 F.R. 3723 and 4176 respectively) postponed that operative date until July 1, 1942.

[2] The strictly pertinent language quoted from the appendix has been italicized for emphasis. The full text of Section (a) of Appendix "A", effective as of all dates here involved is:

"(a) Prime movers, etc.

"Diesel engines, except aircraft diesel engines;

"Gas engines and gas generators;

"Gasoline and kerosene engines for marine, tractor, railway, and stationary use (not including portable outboard motors);

"Hydraulic turbines and hydraulic turbine governors;

"Steam engines and steam turbines."

Obviously, the engines here considered could not be included under any subdivision of the section except that quoted in the body of this memorandum, or under any except the italicized portion of the subdivision there quoted.

Among the items listed in Appendix "C" as excluded from coverage are "Aircraft Gasoline and Diesel Engines". It will also be noted that the exception from coverage of "portable outboard motors" was expressly defined and set out by Amendment No. 69 to MPR 136, as amended, under date of February 19, 1943, and in his statement of considerations filed therewith, the then Administrator stated that the exclusion was entirely clarifying, since the excluded items were expressly covered by MPR 188.

Meanwhile, its prospective operation had evoked a multitude of specific valid criticisms of, and doubts about, its practicability,[3] and, by way of a completely revised regulation, MPR 136, as amended, had been prepared, and was issued on June 30, 1942 (7 F.R. 5047), and made initially effective as of July 22, 1942.

Although they were designed to achieve a single objective in the same field, MPR 136 and MPR 136, as amended, were quite different in structure, especially in the important aspect of their definition of coverage. MPR 136, as originally issued, applied in general terms to all products potentially within the definition of "machines and parts" not specifically excluded from its operation. It was accompanied by an Appendix "B" which identified its exclusions. It also carried an Appendix "A" in which were listed representative and illustrative, but not the exclusive, items within its coverage. MPR 136, as amended, defined its coverage not generally, but rather specifically and exactly, as those items falling within the groups listed in its Appendix "A" and Appendix "B", and identified certain excluded products by their enumeration in its Appendix "C".[4]

■ The initial item appearing in the general classification of included products in Appendix "A" under both of the regulations was "Prime Movers".[5] The analysis of this classification differs in the two regulations. In the original MPR 136, the complete analysis was "Diesel Engines; *Gasoline and Kerosene Engines;* Steam Engines and Steam Turbines; Parts and Accessories of Such Machinery" (directly material subdivision additionally emphasized). The complete analysis in MPR 136, as amended, has already been quoted.[2] Unquestionably, the defendants' engines now considered would have been within the comprehensive coverage of MPR 136, if it had ever become operative. The defendants contend that they are not embraced within the narrower definition of coverage in MPR 136, as amended. After careful consideration the court is unable to agree with that contention, and concludes that all three of the engines involved are within the definition of "gasoline * * * engines for * * * stationary use".

It is not, nor could it be, questioned that the defendants' three gasoline engines are comprehended within the general significance of "prime movers". All internal combustion engines are so classified. The narrow question is whether the engines involved are "engines for stationary use". That they are all properly classifiable as "portable engines" can hardly be doubted, and the plaintiff does not seriously question that classification. Upon the trial, the "Husky" engine exhibited to the court was carried about the court room by counsel for the defendants, and each of the "Cubs" was freely moved on its wheel equipped truck.

The distinction between portable and

---

[3] See "Statement of Considerations Involved in the Issuance of Maximum Price Regulation No. 136, as Amended, Machines and Parts, and Machinery Services", issued by Leon Henderson, Administrator, Office of Price Administration, on June 30, 1942.

[4] Its complete section 1390.1, subsection (a), follows: "The term 'machines and parts' means, and is limited to, products falling within the groups listed in section 1390.32, Appendix 'A', and section 1390.33, Appendix 'B'. Any other product is subject to the General Maximum Price Regulation, unless excluded therefrom or unless subject to some other specific regulation. For purposes of clarification, a list of certain products related to machinery but not covered by this Maximum Price Regulation No. 136, as amended, is contained in section 1390.34, Appendix 'C'."

Its subsection (b) of the same section defines "Machinery Service". But the coverage thus achieved is irrelevant here and is disregarded.

Section 1390.2 identifies certain specifically excluded transactions that are also irrelevant to this case.

[5] "Prime Mover" is judicially defined in Note 1 to Coverdale v. Pipe Line Co., 303 U.S. 604, 607, 58 S.Ct. 736, 738, 82 L. Ed. 1043, as follows: "This term * * * is not defined elsewhere in the statute. Webster's New International Dictionary, 2d Ed. unabridged, 1935, p. 1964, contains the following: 'prime mover. Mech. * * * b An initial source of motive power, as an engine, or machine, the object of which is to receive and modify force and motion as supplied by some natural source, and apply them to drive other machinery, as a water wheel, a water-pressure engine, a wind-mill, a turbine, a tidal motor, a steam engine or other heat engine, etc.' As explained by expert witnesses for the appellant, the internal combustion gas engine is a prime mover which converts heat energy, contained in the natural gas as fuel, into mechanical energy."

[2] See note 2 on page 108.

110

stationary gasoline engines is uniformly recognized. Thus, in McDonough v. Almy 218 Mass. 409, 105 N.E. 1012, 1015, Ann. Cas.1915D, 855, dealing with steam engines, the court said: "The word 'stationary' is defined as 'fixed in a certain station,' 'a steam engine permanently placed'; while 'portable' accurately describes an object 'capable of being borne or carried, easily transported.' Webster's International Dictionary." In application of one or both of the two adjectives, see also Neeley v. Union Potash & Chemical Co., 47 N.M. 100, 137 P.2d 312, in which it was held that an electric motor, itself obviously portable, ceased to be a "portable motor" when it was affixed to a concrete mixer as its power unit, and this notwithstanding the fact that the entire mixer unit was movable; Carrell v. Federal Radio Commission 59 App.D.C. 131, 36 F.2d 117, where a portable broadcasting station is defined as "one which is migratory in character, not being restricted to any single permanent location when in operation, but permitted to operate at any place or places to which its transmitting equipment may be transported by the licensee". Wentworth v. L. & L. Dining Co., 116 Conn. 364, 165 A. 203; Thompson Mfg. Co. v. Smith, 67 N.H. 409, 29 A. 405, 406, 68 Am.St.Rep. 679; and Goff v. Pope, 83 N.C. 123, 124.

Stressing the classification of gasoline engines as either "portable" or "stationary", the defendants argue thus: "Stationary engines are engines for stationary use. A portable engine is not an engine for stationary use." The first of the two statements is obviously accurate. The second averment, however, may not be granted as invariably true. Its error lies in its invalid assumption that the terms "stationary" and "portable", when applied to gasoline engines, furnish an adequate and sharply defined classification, and are mutually exclusory, each of the other. The truth is that they do not provide a real and complete classification; for they undertake to distinguish between various engines according to separate and distinct, or at least overlapping, considerations. "Portability" is predicated of an engine according to the possibility of its relatively convenient transportation. Thus, engines are said to be "portable" when they are comparatively small, light in weight and unattached to a fixed station, and to be "stationary" when they are either actually attached to a fixed station or so large and heavy that they are suitable for use only in a fixed position.

But the adjective "stationary" is equally predicable of engines in another sense, namely their use. And in that significance it is distinguishable from "mobile" use. In the latter category are automobile engines, airplane engines, tractor engines and many others which in actual use are moved from place to place, either providing themselves the utilized motive force or otherwise performing their functions as units of an assembled moving machine. And it is precisely, in respect of their use, and not otherwise, that the Administrator has classified engines in MPR 136, as amended.

Now constant observation and experience make it clear that a gasoline engine of any of the sizes and types here involved is almost invariably used in a stationary position. Quite irrespective of the size and portability of the engine, and even though it may be employed from time to time in a variety of jobs at different locations, it remains stationary in, and during, its actual use. A partial list of the appliances for which such an engine in practice may furnish power is set out in a footnote.[6] These uses are selected from the testimony and from certain publicity material and scientific literature resorted to by counsel in their briefs. But the court might equally well note them judicially. In all of them the power units operate at least for the duration of the operation in a stationary position.

Supporting the position that engines of the sort now being considered are for stationary use is a substantial amount of scientific literature submitted either in evidence or through briefs. Hiscox on "Gas, Gasoline & Oil Engines", (1918 22d Ed., Rev. by V. W. Page) referring to an engine suitable for farm uses, says, pp. 469 and 471: "It should be easy to operate and portable * * * and * * * available at any desired point indoors or out", and

[6] Partial list of machines for which engines of the types involved furnish power: Spraying machines, water pumps, dusting machines, milkers, grain harvesters (exclusive of traction), fanning mills, cream separators, wood saws, grain elevators, meat loaders, hay balers, small corn shellers, grindstones, fanning mills, ensilage packers, battery chargers, blowers, buffers, churns, clippers, compressors, conveyors, hoists, hullers, cooling machinery, feed mixers, pump jacks, saws, shearers, vibrators, Water systems, washing machines.

"Farm engines are usually made in simple one cylinder form when used for stationary power." Jones on "Farm Gas Engines & Tractors" (1938) says, p. 45: "Engines for stationary farm use are usually of the single or two cylinder type", and elsewhere, p. 46, in dealing with larger and multiple cylinder engines, distinguishes between "stationary engines" and "automotive engines", including in the former classification "light weight, single cylinder, medium to high speed engines". Collins on "Gas, Gasoline & Oil Engines" (1919), says very significantly, p. 62: "Stationary and Portable Engines Defined. A stationary engine is, as every body knows, one whose position after it is once set remains so, that is it is intended to stay and run in a fixed place. A portable engine is simply an engine of the stationary type which is mounted on skids or on a hand or horsedrawn truck * * * so that it can be hauled about by some other power than its own and used where it may be needed." Verrill, "Gasoline Engine Book for Boys" (1930) says, p. 157: "A great many small stationary motors are sold, already mounted on skids or frames so they can be readily moved from place to place, while others are mounted on light trucks or wagons. For light work, or where directly connected to machinery, as in the case of vacuum cleaners, pumps, and agricultural machines, this system answers very well, but it is not advisable where a motor is used to run machines in a shop or factory." See, also, Verrill on "Gasoline Engines" (1912), p. 9. It is reasonable to suppose that in classifying gasoline engines according to use, the administrator had in view, if not the foregoing or other comparable literature, at least, the almost universally recognized facts which it recalls.

Expert witnesses for the defendants who distinguished between stationary engines and portable engines, and under careful questioning by the defendants' attorney between portable engines and engines for stationary use, granted however that in its actual employment what is known as a portable engine is often "in stationary use".

It is well to observe at this point that the administrator, in classifying engines according to use, dealt with the purpose of their design and manufacture, their primary use, as distinguished from their ultimate employment. This conclusion is obvious from the phraseology of the cited language of Section (a) of Appendix "A", MPR 136, as amended. It is ineluctable when account is taken of the fact that his regulation was designed for application horizontally to the products of an entire industry, not to the articles manufactured by one, or a selected few, of those engaged in it. Thus, the court considers that, nothing appearing to the contrary, the regulation either applies or does not apply to all engines of the types involved, by whatsoever manufacturer, or in whatsoever part of the country they may be made and marketed. Otherwise chaos would be its consequence. Incidentally, no one has suggested that like or identical engines made by manufacturers competing with the defendants are or are not sold under MPR 136, as amended. Neither side has offered evidence or comment upon that point. But it seems highly probable that the defendants would have done so, if their competitors were actually allowed to operate outside the regulation.

The defendants' chief contention is that their three engines are covered by MPR 246, governing "Manufacturers and Wholesale Prices for Farm Equipment", whose controlling price date is March 31, 1942, instead of October 1, 1941, the base date if they are governed by MPR 136, as amended. Their prices had been raised in the interval between the two dates. Upon that point the question is whether their engines are within the definition of the coverage in MPR 246, for if they were that act would be operative under the terms of both MPR 136, as amended, and MPR 246.[7]

Under MPR 246, section 1361.66, subsection (4), "Farm equipment" is defined as, and said to mean: "Any mechanical equipment, attachment or part used primarily in connection with the production and farm processing for market and farm use of agricultural products, but does not include automobiles, trucks, general purpose tools,

---

[7] It should be observed that by MPR 136, as amended, section 1390.2, title, Exclusions, it is provided that: "This regulation shall not apply to (a) any sale or delivery of a machine or part * * * for which a maximum price is established by any other regulation or order issued by the Office of Price Administration"; and that MPR 246, section 1361.67, provides in part, that: "In any case of conflict it (i. e. MPR 246) supersedes the following maximum price regulations: Maximum Price Regulation No. 136—Machines and Parts and Machinery Services."

hand tools, building material, electrical equipment (except fence controllers), sprays or other chemicals, commercial processing machinery, livestock, seeds, feeds or other agricultural product." Subsection (5) of the same section defines "item of farm equipment" as "any item of complete farm equipment, any attachment for use therewith and any part thereof, whether in a finished or unfinished state, which is covered by this Maximum Price Regulation No. 246", and then refers to the following paragraph of the regulation for the definition of its coverage. The following section, 1361.67, in its subsection (a) provides: "Except as set forth in paragraph (b) of this section this Maximum Price Regulation No. 246 applies to any item of complete farm equipment, any attachment for use therewith and any part thereof whether in a finished or unfinished state. * * *" The subsection or paragraph (b) just noted, deals with exclusions from coverage, and its first item is "any unfinished product in such form as to be used for other purposes as well as for farm equipment."

■ So, the purpose of MPR 246 is manifestly to cover sales in their complete form of products "used primarily in the production and farm processing for market and farm use of agricultural products", and parts therefor only when they are directly designed for that purpose. Both the affirmative and the negative clauses above quoted, and a suggestive but nonexclusive list of farm equipment embodied in its section 1361.66, subsection (4) compel that conclusion. Unless, therefore, the primary use of engines of the types and sizes here involved is the production and farm processing for market and farm use of agricultural products, their coverage under MPR 246 must be denied.

To the court a negative answer to the defendants' claim of coverage under MPR 246 seems imperative. "Primary use" as a test necessitates it. In their briefs, counsel for the respective parties argue the point at length and fortify their contentions by examples. Illustrative examples that appeal to the court are, (a) the walking stirring plow, cited by both briefs, and (b) the horse drawn, hand operated dirt scraper or slip. Manifestly, the plow is used primarily in the production and farm processing of agricultural products. Yet it has many incidental and casual uses, the most notable of which is in the field of the excavation and removal of dirt by building and grading contractors. It seems equally clear that the grader or slip is used and designed primarily as a grading contractor's tool, although comparatively few farms of substantial size may be found which do not have and occasionally use dirt graders or slips.

And light gasoline engines, designed originally to provide industrial power of comparatively small capacity for an almost infinite number and variety of places and purposes, can not be said now to be "used primarily in connection with the production and farm processing of agricultural products", simply because they have been found by experience to be highly useful, and many of them are actually used, upon farms.

Here the court notes as a finding of fact supported by the testimony and also by stipulation that, of the defendants' three types of engines, approximately eighty per cent are sold by the defendants to manufacturers of, or dealers in, farm machinery and equipment and the units thus sold either become parts of machinery or equipment later made and sold by such purchasing manufacturers, or are sold directly by purchasing dealers to farmers for farm use. But that fact does not control the question of coverage. MPR 136, as amended, classifies and covers the sale of machinery within its scope upon a nationwide pattern, and not with reference to the specialized experience of localities or regions, or individual manufacturers. And no effort has been made to show the primary agricultural purpose of engines of the types before the court, considered as an entire product, as distinguished from the particular engines made by the defendants. In part, at least, the design both of MPR 136, as amended, and of the Emergency Price Control Act of 1942 is to achieve identity of base date for maximum price levels as between all competing manufacturers of products within their scope; not precise identity of price or even of maximum allowable price, but identity of date as of which each manufacturer's maximum price is to be determined from his own practice as of that date. Even more persuasively, as the plaintiff argues, if the eighty per cent. of the defendants' product, which in point of experience ultimately reaches the farm in one or another form, should be priced under MPR 246, then an incongruity would arise within the defend-

ants' own operations. For either the remaining twenty per cent would also be priced under MPR 246 to the defendants' advantage 'over their competitors, or it would be priced under MPR 136, as amended, with resultant conflict between the prices of identical products of the defendants' plant and utter impossibility of the practical administration of the control in the defendants' case.

The foregoing discussion serves to emphasize both the fact, and the practical necessity, of the determination of the coverage under MPR 246, by the test of primary use. And it also fortifies this court's conviction that the "use" resorted to in Section (a) of Appendix "A" of MPR 136, as amended, is the primary use of the general product involved, rather than the actual ultimate use of each individual and specific unit of the product.

A word may be said in passing regarding those of the defendants' engines that are sold to manufacturers of farm machinery or equipment and ultimately find their way into larger manufactured units of which they furnish the operating power. It seems clear to the court that when they are sold by the defendants they are at most within the exclusion of Section 1361.67, subsection (b) (1) of MPR 246 as an "unfinished product in such form as to be used for other purposes as well as for farm equipment." Moreover, while the testimony discloses the character of some, it does not identify all, of the several finished or assembled machines into which such engines go, or the numbers of each type, from which it might be determined whether any, or how many, of the final products containing the defendants' engines are governed by MPR 246.

The defendants argue that the phrase "and stationary use" as a general term is governed and controlled under the doctrine of "ejusdem generis" by the more specific terms, "Marine, tractor, railway" which precede it, and thereby is limited to uses of a character kindred to marine, tractor and railway uses. Without unnecessary discussion, the court rejects the contention and signifies its conclusion that the term "stationary use" is to be given its full and reasonable, not a restricted, application.

In reaching its conclusion that the sale of the defendants' engines is within the control of MPR 136, as amended, the court has proceeded objectively, having regard to the regulation and the engines themselves. Its judgment has not been controlled by the course of dealing between the plaintiff and the defendants during the development of the present issues, or by the defendants' various actions and conduct. The parties have severally presented certain contentions upon those matters, which have had the court's careful and respectful consideration, and should now be noted. In that consideration facts and incidents, and especially the contents of letters, will be referred to here quite briefly with the thought that they will be amplified in the findings whose preparation is directed.

The plaintiff has argued that, in its conclusion upon the issue of coverage, the court should be persuasively influenced, if not actually controlled, by what he puts forth as the "Administrator's interpretation" of the coverage of MPR 136, as amended. This interpretation is said to be found chiefly in a letter of the Price Executive, Machinery branch, Office of Price Administration to the defendants (under their trade name) for the attention of the defendant, Cooper, bearing date February 27, 1943, in which the writer of the letter took note of a claim to coverage for their engines under MPR 246, made by the defendants in a letter of February 18, 1943; and stated: "This is not correct. The maximum prices of your industrial gasoline engines are governed by Maximum Price Regulation No. 136, as amended"; and reminded the defendants that they had consistently been advised of the applicability to their engines of MPR 136, as amended. Other comments of similar import are to be found in letters from the Administrator's office to the defendants.

It is clearly recognized that, under the doctrine of Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 324, 325, 53 S.Ct. 350, 77 L.Ed. 796, though the Administrator is without competence to fix the meaning of a statutory phrase, he does have power to interpret his own regulations and any phrase contained in them; and that, in the exercise of that power, his considered determination of the meaning and interpretation of his rules or regulations may have persuasive weight, and where reasonable, even be controlling, when the material interpreted is thereafter under judicial scrutiny. Goodman v. Bowles, Em. App., 138 F.2d 917, 919; Consolidated W. P. & P. Co. v. Bowles, Em.App., 146 F.2d 492, 494; Bowles v. Nu-Way Laundry Co.,

10 Cir., 144 F.2d 741, 746. It is not considered that even the forceful language of Bowles v. Simon, 7 Cir., 145 F.2d 334, 337, correctly understood, denies that effect to administrative interpretation.

But the court is unwilling to accord to the instant correspondence the rank and dignity of administrative construction. It is simply the informal and unpublished statement of his contention, by, or in behalf, of a party to the exact controversy under the court's consideration. As such it is no more persuasive upon this court than the complaint by which the case is instituted. The question still remains whether the contention is valid; and that has been decided by the court, uninfluenced by the fact that the administrator asserted its validity. If, in cases brought by the Administrator under the Emergency Price Control Act of 1942, the court must be either controlled, or even persuasively influenced, by contentions of the Administrator in antecedent correspondence upon the identical litigated claim (prescinding, now, from formal interpretations and the history of consistent application of regulations in similar circumstances), then little would remain for judicial action beyond the registration and enforcement of the Administrator's demand.

It is contended, and the court thinks accurately, that the defendants complied for some period of time after its effective date with MPR 136, as amended. The defendants insist that their compliance was upon the assumption that the original MPR 136 governed their prices. But since that regulation never became operative, and since the defendants have not seen fit to introduce documentary, or even oral, evidence identifying with certainty the dates within which they followed their October 1, 1941 prices, the court regards the assumption to be well grounded that they conformed for some time, at least, with MPR 136, as amended, and continued so to conform until they resolved to orient their prices to the requirements of MPR 246. They signified, by letters written after the effective date of MPR 246, their purpose to resort to its coverage, though they have offered no proof of the precise date upon which they made the change. But the court does not agree with the plaintiff that such temporary compliance was effective either to bar the defendants from abandoning compliance with MPR 136, as amended, upon the theory that they were mistaken respecting its application to their engines, or to prevent them from having recourse to the advantages of MPR 246, upon the theory that it applied from and after its effective date to their engines and supplanted MPR 136, as amended. Of course, the court has rejected both of those theories as objectively invalid; but it has not considered the defendants to have been estopped to pursue them if they or either of them were tenable. No discussion need be offered to sustain the very obvious position that the temporary compliance involves no single element of estoppel. At the most, it could evidence only a construction by the defendants of MPR 136, as amended, favorable to the presently claimed coverage, from which, surely, they might recede in good faith at any subsequent time.

Nor, in the peculiar circumstances of this case does the court consider that the defendants are estopped to deny the effectiveness here of MPR 136, as amended, because of their partially successful recourse to its provisions to obtain relief in the way of price increases for their engines. It is true that on two occasions the defendants have presented to the Office of Price Administration applications for price increases in respect of their two, three and four horsepower water cooled engines, upon forms and with procedure provided under MPR 136, as amended, and thereby obtained, first on November 13, 1943 and again on June 22, 1944 (the latter with revision on September 27, 1944) successive grants of permission to increase the price of the two horsepower water cooled engine only, which, though involved in those applications, is not under scrutiny in this case. In passing it may be mentioned without attaching significance to the circumstance, that the defendants appear from the evidence not to have put into effect the more recent of the two allowed increases. Upon the trial the plaintiff proved those orders and the defendants' applications under which they were made. On their part the defendants introduced evidence of a conversation in the Washington offices of the Administrator between the defendant, Charles D. Ammon, and one of his responsible employees on the one hand, and two identified representatives of the Administrator on the other hand, in the course of which, according to the defendants' version, the defendant, Charles D. Ammon, seeking orally to obtain a price increase, and being advised that the de-

fendants would have to apply for it in writing upon designated forms under MPR 136, as amended, initiated a colloquy which he narrated in the following language: "I said we were not under 136, that we were operating under 246 and that I felt we should file under 246. They said we should file under 136 if we wanted to get any consideration. I said, 'If we file under 136, then you are going to claim we come under 136. We claim we are not under 136.' They stated that that would make no difference under which we filed, that that wouldn't be considered as any waiver on our part of any rights we might have under 246". The plaintiff objected to the introduction of the evidence on the ground that it was immaterial, irrelevant, and neither binding on, nor sufficient to create an estoppel against, the government. The court received the evidence, explicitly recognizing that it could neither bind nor estop either the United States or the plaintiff, but considering also that it might conceivably explain the circumstances under which the defendants had made the applications for price increases, on which the plaintiff had already shown his determination to rely as an estoppel against the defendants. Before accepting the final rests, the court offered to grant a continuance to allow the plaintiff to rebut the defendants' evidence of the conversation, which the plaintiff declined. The court, therefore, finds that the conversation occurred substantially as the witness, Charles D. Ammon, narrated it.

Then, the applications themselves both undertake to emphasize the view of the defendants that their products were made for farm purposes and the second one explicitly identifies MPR 246 as the source of the effective ceiling price, and March 31, 1942 as the critical and determinative price date.

Against that background the court is not disposed to hold that the defendants are estopped by their applications for relief to reassert here their contention that their coverage is under MPR 246. The court does not agree with it, but has fully considered it, unimpaired by their obviously confusing, ambiguous, and inconsistent position in seeking relief under MPR 136, as amended. Representatives of the plaintiff may not lure a regulated concern into a position at variance with its explicitly asserted position and thereafter take sharp advantage of its pursuit of their own counsel. Their conduct does not bind the plaintiff. But it may, and in this situation does, explain and neutralize the action of the defendants. And the authorities cited by the plaintiff do not compel a contrary conclusion.

The court has given full consideration to all of the correspondence between the defendants and the Office of Price Administration which is in evidence. For example, upon learning of the publication of MPR 246, and on November 18, 1942 the defendants filed with the Office of Price Administration a list of their prices upon engines as of March 31, 1942, of which the acting price executive of the machinery branch of the Office of Price Administration made formal acknowledgment in writing on December 4, 1942. Then on December 4, 1942, the defendants addressed to the Lincoln, Nebraska, office of the Office of Price Administration a further letter in which they set out their understanding that their engines were covered under MPR 246 and, among other things, made the following request: "Will you please confirm this, and if we are not correct about this, give us the correct information." The acting state price officer of the Lincoln, Nebraska, office acknowledged that letter on December 11, 1942, sending with his letter a copy of MPR 246 and the statement of considerations accompanying it, but wholly failing to give the defendants the advice requested in the quoted portion of their then most recent letter.

Manifestly, the service of the Lincoln office of the agency was something less than cooperative or instructive. But it has no possible significance in the present case for at least two reasons. In the first place, it could not have misled or confused the defendants in respect of the sales with which they stand charged in this case. For on February 27, 1943, more than two months later than the letter of the Lincoln office of the agency, dated December 11, 1942, but more than seven months before the first date of a violative sale now charged, the Price Executive of the Machinery Branch of the Agency, by letter to the defendants emphatically asserted the applicability to the sales of their engines of MPR 136, as amended, instead of MPR 246. That warning was not less effective because it referred to the engines as "your industrial gasoline engines". No confusion resulted from that possibly equivocal or arbitrary language. And the position of the agency was repeatedly and consistently re-

116

affirmed. Secondly, even erroneous acquiescence by the local Lincoln office of the agency in the defendants' position—and no such acquiescence is shown here—would be inoperative to bind the agency or the United States. United States v. Stewart, 311 U.S. 60, 61 S.Ct. 102, 85 L.Ed. 40; Utah P. & L. Co. v. United States, 243 U.S. 389, 37 S.Ct. 387, 61 L.Ed. 791.

There is no point in the circumstance that MPR 246 first came to the defendants through the Farm Equipment Institute, a national organization of makers of farm equipment. They were members of the institute and were then actually the makers of farm equipment, without reference to gasoline engines.

■ It is also unimportant and quite insignificant that, as stipulated between the parties, the sale of gasoline engines for farm use was controlled during the period involved in this suit by priorities granted to purchasers by the War Food Administration, and that during that period, dealers, distributors, and manufacturers purchasing the engines of the defendants could not resell them for farm use without receiving from their customers priority certificates issued by the War Food Administration. Similarly, while the court recogognizes and has fully considered the stipulated fact that during certain specified periods, including the dates of promulgation and initial operation of MPR 246 the materials for the manufacture of the defendants' engines were obtained under War Production Board limitation orders dealing with materials for the production of farm machinery, equipment, attachments and repair parts, it has not regarded it as controlling upon the important present issue of coverage. The circumstances just noted deal with legislation and administrative machinery quite distinct from the Emergency Price Control Act of 1942, as amended, and the Price Control Agency. They do, indeed, recognize the significance to farm work of some at least of the engines manufactured by the defendants. But they do not show or even tend to establish the coverage of MPR 246 over engines generally, of the types here involved.

■ The applicability of MPR 136, as amended, having been affirmed, the stipulated facts respecting sales necessitate the further conclusion that the defendants have violated its maximum price provisions, and that during the period set out in the complaint the violation resulted in overcharges in the aggregate amount of $11,860.16. The court, therefore, proceeds to the final issue of the scope and extent of its judgment.

In this behalf, the defendants, reserving their defense of want of coverage, have pleaded that, if MPR 136, as amended, applies and they have violated it, "such violation was neither wilful nor the result of failure to take practicable precautions against the occurrence of the violation". 50 U.S.C.A.Appendix § 925 (e), as amended June 30, 1944.[8] Thereby, they have sought the limited indulgence of the amendment just referred to. Although the violation charged began before, but persisted until and after the effective date of the amendment, it is allowed the benefit of the relaxed standard of liability which the amendment provided. However, the court has carefully considered the record and the evidence in this case and has concluded that the facts do not support the defendants in their claim to absolution from the imputation of wilfulness and the failure to take practicable precautions to prevent violation.

It can not be said that the defendants

---

[8] As originally enacted and at the inception of the present violation, 50 U.S. C.A.Appendix § 925(e) provided that the measure of recovery against the seller in a case of this character should be "$50 or * * * treble the amount by which the consideration exceeded the applicable maximum price, whichever is the greater, plus reasonable attorney's fees and costs as determined by the court." By amendment on June 30, 1944, the foregoing statutory measure of recovery was altered in such fashion that the act then was made to provide and now provides that "* * * the seller shall be liable for reasonable attorney's fees and costs as determined by the court, plus whichever of the following sums is the greater: (1) Such amount not more than three times the amount of the overcharge, or the overcharges, upon which the action is based as the court in its discretion may determine, or (2) an amount not less than $25 nor more than $50, as the court in its discretion may determine: Provided, however, That such amount shall be the amount of the overcharge or overcharges or $25, whichever is greater, if the defendant proves that the violation of the regulation, order, or price schedule in question was neither wilfull nor the result of failure to take practicable precautions against the occurrence of the violation."

took any—let alone practicable—precautions to prevent violation of MPR 136, as amended. It is true, as already observed, that they repeatedly asserted their coverage under MPR 246, and on December 4, 1942, made written request upon the Lincoln, Nebraska, office of the Office of Price Administration for confirmation of their claim or corrective information if they were mistaken, which request was never honored. But as early as February 27, 1943, long before the inception of the violation here reviewed, and also thereafter, they were notified in writing in behalf of the Administrator that they were obliged to observe MPR 136, as amended. They simply disagreed with that view of the coverage of the two regulations, and, by their acts and conduct, disregarded the warning of the Administrator. And they took no further precaution against the occurrence of the violation. Their position towards the question of coverage and their action in furtherance of it repel any possible inference of their taking of precautions against violation.

■ Was their conduct wilful? That adjective in its present context has been judicially construed to characterize conduct which is intentional, knowing, voluntary, deliberate, or obstinate, as distinguished from malevolent, or specifically designed to be violative of the law. Zimberg v. United States, 1 Cir., 142 F.2d 132, certiorari denied 323 U.S. 712, 65 S.Ct. 38; Bowles v. Krasno Bros. Glove & Mitten Co., D.C.Wis., 59 F.Supp. 581; Bowles v. Goebel, D.C.N.D., 58 F.Supp. 686; People v. Keane, 181 Misc. 592, 47 N.Y.S.2d 347. This court is in accord with that construction and has consistently followed it.

■ Guided by the foregoing test, the court is compelled to hold that the conduct of the defendants in the premises was clearly wilful. No other conclusion seems to be supportable by the record.

The evidence discloses written warning by the enforcing agency to the defendants, long before the commencement of their violation, of their obligation to observe MPR 136, as amended; the disagreement of the defendants with the position thus taken; and their open violation of the regulation in the face of the warning, though it was repeated more than once.

■ The evidence shows also that during the period of the violation and on May 15, 1944, the defendants sent a circular letter to their engine buyers[9], setting out a proposed program in view of the controversy, which contained the following paragraph: "Regardless of our losses, OPA claims we have been violating their regulations and overcharging you. They have demanded we pay them over $10,000.00, make no refund to you, and reduce our prices. We do not concur in their findings and expect to carry the case through any and all courts which may have jurisdiction over such cases." Of course, no one is to be penalized for resort to the courts for his protection. The quotation is cited merely because it emphasizes the deliberate, purposeful, and obstinate determination of the defendants, not to comply with or observe MPR 136, as amended, unless and until their observance of it should be judicially coerced, and meanwhile to persist in its violation.

■ The defendants seek to better their posture by the contention that they sought legal counsel from their attorney who agreed with the position they had taken. Quite irrespective of the consequence generally of the bona fide observance of the advice of legal counsel, it appears here that recourse to legal advice was inexcusably tardy. Originally, the testimony left the precise time of such consultation in a state of uncertainty. But it was clarified on cross-examination and shown to have been had "sometime in 1944; almost immediately after they advised they were going to bring suit on it." The violation, therefore, may not rightly be attributed to the advice of counsel. It, or at least its beginning antedated resort to counsel.

The court, therefore, holds that the vio-

---

[9] The letter was introduced in evidence by the defendants who emphasized a sentence in it advising customers that all invoices to them of engines after March 31, 1944 are subject to correction and refund for any overcharge, if it is finally determined that there are any. That device can not be allowed to absolve the defendants from their liability for their violation, even if it were—as it clearly does not assume to be—effective for the entire duration of the violation. It requires neither reasoning nor authority to support the conclusion that one may not avoid the consequence of an overcharge under the Act by saying to his purchaser, "I shall refund it to you if I am compelled to do so." Beasley v. Gottlieb, 132 N.J.L. 603, 42 A.2d 305; Zwang v. A. & P. Food Stores, 181 Misc. 375, 46 N.Y.S.2d 747.

lation under scrutiny was both wilful and the result of the failure of the defendants to take practicable—or any—precautions against violation.

■ There remains the important problem of the precise relief that shall be awarded the plaintiff. Injunctive relief, in view of the position of the defendants and their persisting violation, will be granted as prayed against their further selling of their engines at prices above those prescribed in MPR 136, as amended. The measure of the judgment for the payment of money involves brief further consideration.

■ The plaintiff contends that under the provisions of 50 U.S.C.A. Appendix § 925(e) as amended June 30, 1944, the court, having found that the defendants have failed to prove that their violation was neither wilful nor the result of failure to take practicable precautions against the occurrence of the violation, has no discretion in the premises but must imperatively award him judgment against the defendants for three times the amount of the overcharge. While the result here reached does not differ from that for which the plaintiff contends, the court expressly disagrees with the plaintiff's construction of the cited section of the statute.

In a comparatively recent unreported memorandum opinion dealing with the question, this court said:

"The court encounters at the outset the question whether, even though the issue of wilful violation and the taking of practicable precautions should be resolved against the defendant, the plaintiff, under the presently effective statute, would have an inflexible statutory right to a judgment against the defendant for three times the overcharge incident to the sale (omitting present discussion of reasonable attorneys fees and costs as an element of recovery). Such a right is necessarily asserted as the very foundation of the plaintiff's successive motions, for he can not insist as a matter of right upon the precise amount of three times the overcharge, if the statute does not accord him that right, and place his recovery beyond diminution in the exercise of judicial discretion.

"After careful consideration of the form in which Title 50 U.S.C.A. Appendix Section 925(e) was originally enacted, and the language of its amendment by the act of June 30, 1944, the court can not agree with the plaintiff that, where a defendant violator of an applicable regulation fails to bring himself within the amendatory proviso, judgment must necessarily be for three times the overcharge, presumably with attorneys fees and costs. That, in its original form, the statute mandatorily required triple recovery is obvious from its language. Nor did the absence of wilfulness or the taking of practicable precautions to prevent violation, or both in combination, avail to mitigate the rigor of the civil liability created by the act. Beyond question, it was the very inflexibility of that provision for enforcement embodied in the original act which prompted the quoted amendment of June 30, 1944.

"The language of the amendment appears to the court to allow no possible foundation for the plaintiff's claim that under it, if the defendant violator fails to exculpate himself from the inference of wilfulness and the failure to take practicable precautions, the judgment must always be for three times the amount of the overcharge, together with attorney's fees and costs. In such a situation, the judgment, in addition to reasonable attorney's fees and costs, is directed by the amended statute to be for 'whichever of the following sums is the greater: (1) *Such amount not more than three times the amount of the overcharge, or the overcharges, upon which the action is based as the court in its discretion may determine,* or (2) an amount not less than $25 nor more than $50, as the court in its discretion may determine.' The amount of recovery is thus not rigidly prescribed but, (omitting a petty violation which, by alternative (2), invokes the employment of a discretionary figure between $25 and $50 without reference to the precise amount of the overcharge) may be for such amount, not more than three times the amount of the overcharge, as the court in its discretion may determine. Judicial discretion respecting the amount of the judgment is, therefore, invited, even directed; and the exercise of judicial discretion is incompatible with the existence in favor of the administrator of an absolute right to judgment in the precise sum of three times the amount of the overcharge. That is simply the maximum limitation upon the exercise of the court's discretion.

"Which leads to the observation that there is no express prescription of a minimum limitation in the same behalf. However, at least two considerations would ap-

pear to direct the court to a minimum figure, below which its judgment could hardly go in the exercise of authentic judicial discretion. One such consideration arises from the circumstance that, by a judgment for less than the amount of the overcharge, the transgressing defendant would be allowed to retain a profit from his wrongdoing. The other recognizes that, under the amendatory proviso of Title 50 U.S.C.A. Appendix, Section 925(e), even a defendant whose violation was not wilful and happened despite his practicable precautions to avoid it, must be adjudged to pay the full amount of the overcharge (still disregarding a petty violation resulting in a judgment for $25). So a defendant failing to prove the facts entitling him to the indulgence of the proviso, should be subjected to a judgment for such amount, (in addition to a reasonable attorney's fee and costs) as the court in its discretion may determine, not, in any event, more than three times the amount of the overcharge, nor less, it would reasonably seem, than the amount of the overcharge."

Judge Vogel of the United States District Court for the District of North Dakota has lately expressed the same view in Bowles v. Goebel, D.C.N.D., 58 F.Supp. 686. The court is quite aware of the probably contrary view expressed in Bowles v. Krasno Bros. Glove & Mitten Co., D.C. Wis., 59 F.Supp. 581, but does not agree with it. Nor does this court consider that the ruling under date of May 15, 1945 by the Circuit Court of Appeals for the Eighth Circuit in Bowles v. Sharp, 149 F.2d 148, is a determination of the proper construction of the cited language. In that case there appears to have been no real submission, analysis or considered decision upon the issue, though the language of the per curiam opinion, apart from its setting, may arguably be held to support the plaintiff's view that judicial discretion may not award a judgment for some amount between the exact amount of an overcharge and three times that sum where the defendant fails to sustain the burden of proving his right to the limited defense granted in the amendment.

However, although the court rejects the plaintiff's theory which would intercept the employment of judicial discretion in respect of the amount of its money judgment, that discretion may not rightly be employed here to reach a conclusion unjustifiably indulgent towards the defendants.

At no point in the course of this decision has the court considered or found that the defendants have been guilty of malice or formal bad faith in their action. Nor does the court hold that its conclusion respecting coverage is so obvious and inevitable that an opinion to the contrary could not be entertained sincerely. In fact, a practical doubt upon that question in the court's own mind, when demand was made for a preliminary injunction, concurred with the utterly incompetent character of, much of the plaintiff's evidence then presented, in moving the court to deny injunctive relief pending the final trial.

But that being understood, the defendants' tenacity in adhering to their own opinion, their obstinate refusal to accept the contention that their operations were and are within the coverage of the regulation, and resolution to operate outside its requirements, were simply a persistent challenge to the plaintiff either to acquiesce in their view of the coverage of their product or to vindicate his own position by resort to litigation. Now that he has chosen the latter alternative, no element or factor in the defendants' conduct persuades the court that it should accord them any leniency in the measure of the judgment against them. Such indulgence is usually fortified by considerations which are not discernible in this case. Unindicated judicial lenity in this vital respect would thwart the efforts of the Administrator and defeat the worthy and imperative purpose of the Act, by removing the most persuasive sanction against determined and obstinate violation of regulations in pursuance of an objectively erroneous opinion respecting their operation entertained by the violator.

Therefore, the judgment will also require the defendants to pay to the plaintiff $35,580.48, or three times the aggregate overcharges, and the costs of the suit. No award of an attorney's fee is explicitly sought, and none will be made.

Counsel for the plaintiff will promptly prepare and serve upon counsel for the defendants, comprehensive Findings of Fact and Conclusions of Law, and a Judgment in accordance with the announcement of ruling herein made. If within fifteen days after such service no Objections or Counter Findings or Counter Conclusions be served upon counsel for the plaintiff, he will thereupon present his proposed Findings, Conclusions and Judgment to the

120

court for examination and approval. If, within such time, Objections or Counter Findings or Counter Conclusions be so served, then upon five days' notice in writing to opposing counsel, counsel for either party may present the proposed Findings, Conclusions and Judgment to the judge at Lincoln, Nebraska, for settlement.

Except as to matters of fact or of law formally determined herein, the court directs that counsel be not limited to, or by, the language of this memorandum in preparing Findings of Fact or Conclusions of Law. Several factual details either admitted by the pleadings, or stipulated, or established by evidence, e. g., the history of the succession by the defendants to an earlier corporate business operation, and sundry items of correspondence, though fully considered by the court, have not been singled out and separately discussed in this memorandum. Specifically, counsel in referring to written letters or documents, will either set them out in their entirety or abstract them in all of their aspects, whether they appear to sustain or to impair the present ruling of the court. The plaintiff may expressly except to the incorporation of Findings or Conclusions adverse to him; and exception is allowed the defendants both to specific Findings and Conclusions adverse to them and to the Judgment announced herewith and to both of its elements; and the Findings and Conclusions will so provide.