MARY MONAHAN, Plaintiff, *v.* JACOBS AND POLITI, Defendants.

City Court of Albany, June 26, 1946.

*Henry H. Koblintz* for plaintiff.

*Ellis J. Staley, Jr.,* for defendants.

HERZOG, J. On April 3, 1946, plaintiff purchased a used 1936 Dodge sedan from the defendants for the sum of $460. The " as is " price for this car was stipulated as $376 and the additional $84 was for warranting the car. Defendants, at the time of the sale, executed and delivered to plaintiff the dealer's warranty provided for in subdivision (c) of section 7 of Maximum Price Regulation 540 of the Office of Price Administration (10 Federal Register 1383, 1385, as amd.), hereinafter referred to as " regulation ". The service supplier's guaranty set forth in subdivision (d) of section 7 was not made part of the warranty nor was any such guarantee given to plaintiff.

Shortly after the sale, plaintiff brought the car back to the defendants and stated that the car was not in good operating condition. Defendants offered to repair the car on a fifty-fifty basis. Plaintiff refused to accept this and kept the car, and has used it very little, if any, since that date. Plaintiff then commenced this action. She asserts two causes of action: (1) Breach of warranty and (2) that the dealer's warranty given was defective so that the dealer was not authorized to accept more than the " as is " price. She demands damages in treble the amount of the overcharge of $84. Defendant contended that the car was in good operating condition at the time it was sold and if there was any improper warranty given it was done inadvertently and purely by mistake.

The case was tried by the court without a jury.

The questions for the court's determination are, therefore: (1) Whether there was a breach of warranty; (2) whether the warranty was properly given or was fatally defective; (3) if there was a breach of warranty or the warranty given was defective, what amount of damages should be awarded. It is interest-

ing to note that research by both court and counsel has brought to light only a few reported decisions in this State on these points, and most of them arise out of claims for excess rent. Because of the increasing number of these cases in this court, and also because of the evident misinterpretation by dealers and used car buyers of their rights and liabilities under the regulation, I feel it desirable to set forth my understanding of the law that should be applied to this type of case.

In the first place, it is my opinion and I have so held previously, that the warranty given by the dealers is twofold. It guarantees, first, that the car is in good operating condition, and secondly, that it will remain in such condition under normal use for a period of thirty days or 1,000 miles. Then, in the second paragraph of the prescribed form in subdivision (c) of section 7, the dealer agrees to repair the car as " may be necessary to its good operating condition in accordance with normal use and service ". Such repairs are to be made on a fifty-fifty basis. This is the clause which causes confusion. It appears to be perfectly clear, but many are apparently under the impression that this limits the dealer's liability to 50% of the cost of any repairs necessary to put the car in good operating condition. This is true *if the car was in good condition when sold* and then, through normal use, gets out of such condition. However, it is a condition precedent that the car was in good condition when sold. If such be not the fact, then the dealer is liable for his breach of the first warranty and he has made an overcharge in the amount of the warranted price, under paragraph (3) of subdivision (b) of section 5 of the Regulation (10 Federal Register 1384). Such an overcharge gives the buyer the remedies provided in subdivision (e) of section 205 of the Emergency Price Control Act of 1942. (U. S. Code, tit. 50, Appendix, § 925, as amd.; hereinafter referred to as " Price Control Act ".)

In this case the plaintiff contends that the car was not in good operating condition when sold, and that she, therefore, has the remedies set forth above. Subdivision (b) of section 7 of the Regulation (10 Federal Register 1385) affords the definition which must be my guide in determining this question. It provides: " *Good operating condition.* A used car is in good operating condition when its functional parts, and those of its nonfunctional parts which are customarily attached to a car, are in a condition that will permit the used car to be driven safely and efficiently. Functional parts include but are not limited to: the chassis, motor, clutch, transmission, drive shaft, differential, steering mechanism, front axle, rear axle, brakes,

battery and lighting system." Plaintiff's witnesses testified to the effect that the brakes, the transmission, clutch and certain other parts were not in good operating condition and that the car could not be driven safely and efficiently. Without reviewing all the evidence, I find that the plaintiff has sustained the burden of proof on this point and that at the time of the sale this automobile was not in good operating condition as comprehended by the regulation.

This would seemingly bring me immediately to the question of damages, but since the other cause of action alleged by the plaintiff must enter into the consideration of damages, because of the discretion left to the court by subdivision (e) of section 205 of the Price Control Act, I must also consider that. Subdivision (a) of section 7 (10 Federal Register 1385) defines " A warranted used car ". It provides, among other things, that it is a car for which " a dealer (as defined in section 15(b)) " furnishes the necessary warranty in writing. It then goes on to state in paragraph (3) of subdivision (a) of section 7 in the case of a dealer who does not have adequate facilities for repairing or reconditioning used cars, it shall be a car for which the service supplier guarantees in writing to make the necessary repairs and replacements. This guaranty must be made as provided in subdivision (d) of section 7. Subdivision (d) of section 7 gives the form and provides that it " * * * shall be part of the same document that contains the ' Dealer's Warranty ' for such a used car, and shall be stated in that document immediately below the address of the dealer * * *." It was admitted that the defendants were not authorized to recondition and repair used cars and that, in accordance with subdivision (b) of section 15 (10 Federal Register 1386), they had a working arrangement with an authorized service supplier. The original warranty was introduced in evidence. It did not contain the service supplier's guarantee nor did the service supplier's name appear anywhere on it. Therefore, under the regulation as outlined above, this was not " A warranted used car " and defendants were not authorized to sell it for more than the " as is " price (see § 5, subd. [b], par. [1], [2]).

It might be contended that such a defect was inconsequential and merely a matter of form. However, in *United States* v. *Stein* (154 F. 2d 254) the Circuit Court of Appeals for this circuit in considering this particular section of the regulation said at page 255: " The definition of a dealer just quoted limits the privilege to a person who has, either himself or by arrangement with another and approved as stated, the necessary facili-

ties for repairing and reconditioning the cars sold, that is, for making his warranty effective. Unless he can so qualify, he must accept the lower ' as is ' price, and the purchaser takes the car in the condition in which it is found. The regulation seems entirely reasonable; it allows the higher price only to those dealers who are in a position, and do agree, to keep the cars in good condition for a time, thus prolonging the useful life in wartime of used cars.'' I think the defect is substantial and more than a matter of form. By signing the guaranty the service supplier only guarantees the making of the repairs during the initial period. However, the reasonable and natural assumption behind this is that he, having adequate and approved facilities for reconditioning, has either reconditioned the car or had an opportunity to examine it to make sure that it is in good operating condition or he would not agree to make repairs. The purchaser is entitled to rely on this assumption. The defendant's service supplier had not signed the warranty nor apparently even seen the car in this case. Therefore, it is my opinion that such defect is vital and defendants had no right to sell the car for more than the " as is " price, and are liable to the plaintiff under subdivision (e) of section 205.

This, then, brings me to a consideration of the factors involved in the award of damages. Subdivision (e) of section 205 of the Price Control Act provides (so far as applicable) that the seller shall be liable for " Such amount not more than three times the amount of the overcharge, * * * as the court in its discretion may determine ". By the amendment of June 30, 1944, to the original act, Congress added the so called " Chandler Defense ": " *Provided, however,* that such amount shall be the amount of the overcharge * * * or $25, whichever is greater, if the defendant proves that the violation of the regulation, order, or price schedule in question was neither wilfull nor the result of failure to take practicable precautions against the occurrence of the violation ". Thus, it is necessary for me to determine from the facts, whether the violations listed above were (1) willful and (2) were due to the failure to take the necessary precautions. Under the old act, the courts had no discretion but to award treble damages in the event an overcharge was found. This caused undue hardship in those cases where the violation was not willful and was purely accidental, as treble damages were mandatory. (*Thierry* v. *Gilbert,* 147 F. 2d 603; *Dunakin* v. *Southwestern Consumers Co-op. Ass'n.* 49 N. M. 69.)

Were the violations willful? The meaning of " willful " as used in this section has been construed by the courts on a number

of occasions. The gist of these decisions is that it means, " intentional, knowing, voluntary, deliberate, or obstinate, as distinguished from malevolent, or specifically designed to be violative of the law." (*Bowles* v. *Ammon,* 61 F. Supp. 106, 117; *Bowles* v. *Jung,* 57 F. Supp. 701; *Bowles* v. *Heinel Motors,* 59 F. Supp. 759; *Zimberg* v. *United States,* 142 F. 2d 132, certiorari denied 323 U. S. 712; *People* v. *Keane,* 181 Misc. 592; *Rainbow Dyeing & Cleaning Co.* v. *Bowles,* 150 F. 2d 273.) Good faith seems to be the real test.

It thus becomes necessary to apply this definition to the instant case. With regard to the actual violation of the warranty in that the car was not in good operating condition, I find no willfulness as it was apparent that the defendants drove the car themselves and apparently were of the opinion that the car was in good operating condition. However, with regard to the violation of the regulation in failing to warrant the car properly, I reach a different conclusion. The defendants stated on the stand that they did not know of the regulation and were not familiar with it and did not feel that it was necessary to have the service supplier sign the warranty. The burden of proof is on the defendants to sustain this defense and, although they have asserted that they were unfamiliar with the regulation, I find it difficult to believe this. The dealer's warranty they gave plaintiff was taken verbatim from the regulation. In the succeeding paragraph is the service supplier's guaranty. It is hard to see how anyone reading the regulation could fail to note the succeeding paragraph. Even if it is contended this could be overlooked, this excuse completely fails, in my opinion, when the requirements for the grant of an application are examined. Section 15 provides that a dealer must file an Office of Price Administration form which is listed as Appendix J of the Regulation. Defendants executed such a form and answered the questions contained in it. Question No. 9 was answered in the negative — that they did not operate their own service department. The succeeding question on the form is No. 10 which reads: " If answer to Item 9 is ' No,' do you have a working arrangement by written contract with a service supplier who has facilities, in general, adequate to place a vehicle in good operating condition as defined in the applicable regulation or to make the repairs and replacements required by the warranty in the applicable regulation?

" If answer is ' Yes,' attach a certified copy of the written contract and answer both Part II and Part III."

Question No. 10 and the answer to it lead me to the inevitable conclusion that the defendants must have realized the significance and meaning of a " service supplier ". Add to this the fact that they even had to attach a certified copy of a written contract with such a supplier who agreed to make the repairs required by the guaranty and also that he had to sign their application. From all this I cannot believe that they could have unintentionally and unknowingly omitted this essential part from the warranty given, which in all other respects conformed to the regulation. Their plea of ignorance seems unfounded to me. For these reasons, it is my opinion that defendants, in omitting a necessary paragraph from the guaranty did so willfully.

This then brings up the question of whether the defendants took all practicable precautions. My feeling is in the negative on both of the alleged violations. In the first place, as to the actual breach of warranty, in that the car was not in good operating condition, the defendants' testimony was that their mechanic examined the car and put in a new battery and generally repaired it. This testimony was permitted to be given very freely and it is significant that this mechanic did not take the stand nor was any reason for his absence shown. The defendants set a value of $20 by their own records on the cost of reconditioning this car. This appeared to be on its face only an arbitrary figure. The only precautions taken by the defendants were to have their own mechanic examine the vehicle. I think that this was not sufficient. They had a written contract with a service supplier who was bound to recondition and repair their cars. The Office of Price Administration had found that the defendants did not have adequate facilities to recondition automobiles and the defendants knew this, and because of this fact, entered into a written contract with a supplier who could furnish these facilities. Therefore, I think that it was incumbent upon the defendants to have had their service supplier examine the car and recondition it before they could sell it as a warranted car. Failure to do so, or even to have an authorized mechanic or supplier examine the vehicle, shows lack of practicable precautions under the circumstances of this particular case in my opinion. The defendants made much of the fact that this was a very old car and could not be expected to be in perfect condition. That is obvious, but in order for the defendants to obtain legally the additional sum of $84 on the sale of this car they had to warrant that it could be driven safely and efficiently in spite of its age, which was not the case.

It is my opinion that it is implicit in my finding of a willful failure to comply with the regulation in making a warranty, that the defendant did not take practicable precautions. It necessarily follows from this willful violation that no precautions could have been taken.

It appears, from a reading of a number of authorities, that the administrator has strenuously contended for a long period of time that finding by the court that a violation was both willful and due to failure to take practicable precautions, makes an award of treble damages mandatory. Although there are no cases in this jurisdiction deciding this question, there are a number of decisions in the higher Federal courts holding that even after such finding the award of treble damages is in the court's discretion. In *Bowles* v. *Goebel* (151 F. 2d 671, 673) the court said: " To state the situation slightly variantly — the amended statute, in all cases except when the violation is proved to be neither wilfull nor the result of failure to take practicable precautions, makes the question of the allowance of multiple damages and of the extent of their amount a matter for the legal conscience and responsibly exercised judgment of the court on the circumstances of the particular case, instead of one of legislative absoluteness and fixed prescription." (See, also, *Bowles* v. *Krodel,* 149 F. 2d 398, which overrules *Bowles* v. *Krasno Bros. Glove & Mitten Co.,* 59 F. Supp. 581; *Bowles* v. *Ammon,* 61 F. Supp. 106, *supra*; cf. *Bowles* v. *Hasting,* 146 F. 2d 94.) These authorities are controlling. Thus, despite my finding that the defendants have not sustained the burden of proof on their freedom from willfulness and that they have taken all practicable precautions, the amount of damages is still in the discretion of the court.

That discretion must be exercised to secure the purposes for which the act was passed. This was well expressed by Mr. Justice DOUGLAS in the leading case of *Hecht Co.* v. *Bowles* (321 U. S. 321, 331) in construing a different section of the act when he said: "The Administrator does not carry the sole burden of the war against inflation. The courts also have been entrusted with a share of that responsibility, and their discretion under § 205(a) must be exercised in light of the large objectives of the Act, for the standards of the public interest, not the requirements of private litigation, measure the propriety and need for injunctive relief in these cases. That discretion should reflect an acute awareness of the Congressional admonition that ' of all the consequences of war, except human slaughter, inflation is the most destructive ' (S. Rep. No. 931, *supra,* p. 2) and

that delay or indifference may be fatal." And, again, the Circuit Court of Appeals of the Seventh Circuit in *Bowles* v. *Montgomery Ward & Co.* (143 F. 2d 38, 43) said: " The success of the Act is dependent upon the patriotic co-operation of all persons to whom it is applicable. Apathy and indifference not only increase the burden of the enforcement agencies, but endanger the ultimate success of the whole program. * * * Any easy attitude of the courts which even remotely suggests that the Act may be violated with impunity strikes at the entire enforcement problem."

The language used in *Bowles* v. *Ammon* (61 F. Supp. 106, 119, *supra*) is significant: " Unindicated judicial lenity in this vital respect would thwart the efforts of the Administrator and defeat the worthy and imperative purpose of the Act, by removing the most persuasive sanction against determined and obstinate violation of regulations * * *."

The only case which even remotely offers assistance upon facts similar to the instant case is *Bowles* v. *Goebel* (151 F. 2d 671, *supra*) where it was said, at page 674: " * * * controversy revolved primarily around the fact that that dealer had charged the ' reconditioned and guaranteed ' price without having used the guarantee and price form which the regulation provided for such sales." The trial court left the question of treble damages solely to the jury. I think this was erroneous, but since no exception was taken it could not be reviewed upon the appeal. The jury awarded damages in only the amount of overcharge. This, of course, cannot be binding upon me. " Discretion " is defined in the same case, at page 674 as: " Discretion in a legal sense necessarily is the responsible exercise of official conscience on all the facts of a particular situation in the light of the purpose for which the power exists."

It was stipulated that the amount of the overcharge was $84. Defendants have been in business for only a short period of time. Exercising my discretion in accordance with the principles which have been outlined above, I think that the purposes of the act will be effectuated by a judgment for plaintiff of two and one-half times the amount of the overcharge or the sum of $210. The act also provides that the seller shall be liable for reasonable attorneys' fees in such an action as this. Award of attorneys' fees is mandatory. (*Aronwald* v. *Sperber*, 184 Misc. 314; *Ward* v. *Bochino*, 181 Misc. 355, 359, affd. 268 App. Div. 814.) Attorneys' fees are allowed to plaintiff's attorney in the sum of $75.

Judgment for plaintiff for $210 together with statutory costs and attorneys' fees in the sum of $75.