**BOWLES, Adm'r, Office of Price Administration, v. PASSINI et al.**

**Civil Action No. 1361.**

District Court, E. D. Wisconsin.

July 19, 1945.

John J. Burke and Lee K. Beznor, both of Milwaukee, Wis., for plaintiff.

Harte & Natanson, of New York City (by Stanley J. Harte, of New York City), for defendants.

Bassuener, Humke & Poole, of Sheboygan, Wis., guardian ad litem for Addilio and Elizabeth Passini.

DUFFY, District Judge.

The Price Administrator brings this action, pursuant to Sec. 205(e) of the Emergency Price Control Act of 1942, as amended, 50 U.S.C.A.Appendix, § 925(e), to recover treble damages for alleged overceiling sales of domestic Italian cheese subsequent to January 13, 1943. The sales in question are claimed to be violative of MPR 280, as amended, which as originally promulgated was effective December 5, 1942. Provisions of the regulation in so far as applicable read:

"Sec. 1351.803. Maximum Prices. (a) The seller's maximum price for any listed

food product shall be the highest price charged by the seller during the period September 28, 1942, to October 2, 1942, inclusive, for the same listed food product; * * *

"Sec. 1351.816. Definitions. (a) When used in this Maximum Price Regulation No. 280, the term:

    *     *     *     *     *     *

"(2) 'Highest price charged during the base period' means the highest price which the seller * * * charged for a listed food product delivered by him during the period from September 28, 1942, to October 2, 1942, inclusive, to a purchaser of the same class, * * *

"(3) 'Purchaser of the same class' refers to the practice followed by the seller in the ninety-day period preceding October 2, 1942, in setting different prices for sales to different purchasers (for example, but not limited to, manufacturer, wholesaler, jobber, retailer, government agency, public institutions, individual consumer, or any ordinarily recognized subgroup or combination of the foregoing) or for purchasers located in different areas or for different quantities or under different conditions of sale."

Through OPA adjustments the prices on domestic Italian cheese as above limited were later increased, that is, rolled forward, after February 10, 1943.

The defendants, a family consisting of father, mother, and three children, operate a small cheese factory at Mitchell, Wisconsin, a community near Plymouth. The business was founded by the father and mother about twenty years ago and has been confined to the manufacture and sale of Italian type cheese. As the children grew up and were able to work they were taken into the business. The family make their home in part of the factory building.

This family of Italian immigrants has managed to slowly expand and develop their business. Their success appears to have come from the practice of thrift and fair dealing, attended with the marketing of a good product. Most of their dealings were with wholesalers. Their prices were in line with those of competitors. No sug- gestion has been ventured that the defendants ever engaged in so-called black market operations. Even to this day the elder Passini, independent of any price list, fixes the price involved in every sale and otherwise gives each transaction personal attention.

While the defendants manufacture and sell several types of domestic Italian cheese, sales with respect to only two types, Asiago and Provolone cheeses, are involved. The issues to be determined relate to sales of Provolone. As sold this type consists of several sizes and weights: Salam, 12 lbs.; Provolone, 10 lbs.; Provolette, 5 lbs.; Provolencina, 3 lbs.; Midget, 1 lb. In any given sale all these sizes appear to have been sold generally at a uniform price per pound.*

▇ The question for determination is whether the defendants followed the "practice" of setting different prices per pound to different purchasers of Provolone cheese in the 90 day period preceding October 2, 1942. The burden of proof to establish such practice is upon the plaintiff. If defendants had no such practice, then the permissible maximum price for any of defendants' products is the highest price charged for its sale and delivery to any of their purchasers during the base period, September 28, 1942, to October 2, 1942, plus later OPA adjustments.

▇ According to both judicial and administrative interpretation, classes of customers exist within the meaning of the regulation if in the 90 day period preceding October 2, 1942, the defendants *regularly* charged certain customers certain prices and other customers higher prices. Rainbow Dyeing and Cleaning Co., Inc. v. Bowles, App.D.C., 150 F.2d 273. Plaintiff contends that defendants' invoices covering the period in question disclose that on sales of Provolone cheese defendants regularly charged certain customers certain prices and other customers other prices. Indeed, plaintiff asserts that the invoices indicate defendants had four or five classes of customers.

▇ It is my judgment and opinion that the invoices for the period in question show

---

* For example, in five instances out of fifty sales of Midget in the 90 day period prescribed in the regulation, the defendants' pricing was 1¢ higher, representing under the evidence a quality differential. In these five instances (not in the other forty-five) Midget was expressly named in the covering invoices, so as to distinguish the superior grade or quality of such cheese. The propriety of such price differential is not questioned.

no regularity of prices to any purchaser or to any group of purchasers regardless of volume of sales, and reveal instead a total lack of any pricing "practice" or pattern. Apparently the prices were fixed at will by the elder Passini, on an unpredictable basis, and even though they seem to have been inconsistent at times, his determination of the price was final.

During said base period and for more than a year prior thereto conditions in the domestic Italian cheese industry were such that it was unnecessary and unwise for defendants to have sold their products to classes of purchasers. When Italy entered World War II as a belligerent, our importations of cheese from that country were cut off. Previous thereto we had imported as high as 30,000,000 pounds per year. The disappearance of the imported article from the market caused a greatly increased demand for domestic Italian cheese such as manufactured by the defendants. Other difficulties beset all makers of cheese after the entry of the United States into the conflict, and the situation became such that manufacturers of domestic Italian cheese did not need to look for buyers, for they were being importuned on all sides to sell, and had more orders than they could possibly fill. Thus, large orders were of no advantage to the defendants. In short, such conditions did not lend themselves to the practice of having classes of purchasers, and it is not surprising that the defendants had none.

As the defendants had no classes of customers during the designated 90 day period, their maximum price for Provolone cheese became the highest price charged for an actual delivery during the base period of September 28 to October 2, 1942, which was 31¢ a pound, plus OPA adjustments when and as they became effective.

On the whole record it is clear there were no sales of Provolone cheese at prices in excess of the maximum provided in MPR 280.

As to the sales of Asiago, defendants stipulated at the pre-trial conference, "Defendants admit violations of approximately $1,300.00 in the sale of fresh Asiago." Subsequent conferences were held and at the end of the trial it was stipulated that the Asiago violations amounted to $900 instead. Plaintiff now seeks judgment for $2,700 as treble damages, while defendants' counsel who attended the pre-trial confer-

ence contends that he understood the stipulation there agreed to contemplated the entry of judgment in the sum mentioned and that the later stipulation of $900 was, in effect, an amendment to the agreement for judgment. My understanding was that the stipulation merely fixed the amount of the excess beyond the maximum price involved in overceiling sales of Asiago cheese. The question therefore remains: Should there be an assessment of treble damages?

I find that the defendants acted in entire good faith. I believe they took reasonable precautions not to violate the regulation. In addition to communicating with OPA, they conferred with the field investigator sent out to examine their books and adopted his determination as to what the maximum price should be upon various kinds of cheese. They asked for and received permission to copy the schedule of maximum prices which he prepared from their books. This is not a case in which treble damages should be awarded.

The plaintiff may have judgment for $900 and costs. The attorneys for the defendants shall promptly prepare findings of fact, conclusions of law, and judgment, submitting same to the attorneys for the plaintiff prior to presentation to the court.