**RAINBOW DYEING & CLEANING CO., Inc.,
v. BOWLES, Administrator, Office of
Price Administration.**

No. 8887.

United States Court of Appeals
District of Columbia.

Argued Feb. 13, 1945.

Decided May 28, 1945.

Motion to Vacate Judgment Granted
June 18, 1945.

Mr. Arthur L. Willcher, of Washington, D. C., with whom Mr. W. E. Cumberland, of Washington, D. C., was on the brief, for appellant.

Mr. A. M. Dreyer, Office of Price Administration, of Washington, D. C., with whom Messrs. Thomas I. Emerson, Deputy Administrator for Enforcement, Fleming James, Jr., Director, Litigation Division, David London, Chief, Appellate Branch, and Carl W. Berueffy, District Enforcement Attorney, all of the Office of Price Administration, all of Washington, D. C., were on the brief, for appellee. Messrs. John L. Laskey and J. Grahame Walker, both of Washington, D. C., also entered appearances for appellee.

Before GRONER, Chief Justice, and EDGERTON and ARNOLD, Associate Justices.

EDGERTON, Associate Justice.

This suit was brought by appellee, the Administrator of the Office of Price Administration, against appellant Rainbow Dyeing and Cleaning Co., Inc., to recover three times the amount of certain overcharges. Appellant is in the wholesale dry cleaning business. During March 1942 appellant regularly charged certain customers certain prices and other customers higher prices for the same services. In the ordinary sense of the words, all these customers appear to have been in the same class. The price differences appear to have been

due to differences in competitive or bargaining conditions. On July 3, 1943, appellant commenced charging its formerly favored customers higher prices than it had charged them in March 1942. It did not charge them higher prices than it had charged its less favored customers in March 1942.

Maximum Price Regulation 165, § 1499.-102, prohibits dealing in consumer services at prices higher than the highest prices which the seller charged during March 1942 to a "purchaser of the same class." The quotation marks, as well as the quoted words, are used in the Regulation itself. It thereby draws attention to the fact that it does not use the words "purchaser of the same class" in their ordinary sense but in a special sense which it defines. Section 1499.116 supplies the definition: "'Purchaser of the same class' refers to the *practice adopted by the seller in setting different prices* for consumer services for sales *to different purchasers* or kinds of purchasers * * * or for purchasers located in different areas or for different quantities or grades or under different conditions of sale."[1]

█ It follows from the definition just quoted that appellant's price increases violated the Regulation. The definition indicates that a seller's *practice* "in setting different prices * * * to different purchasers" puts each purchaser who pays a different price according to this practice in a different "class."[2] Otherwise the term "different purchasers," in the quoted definition, appears to have no meaning. No one, as far as we know, has suggested any other meaning which it can possibly have. In order to acquit appellant of violating the Regulation it would be necessary to read entirely out of the definition the words "purchasers or," with the result that the term "different purchasers" would disappear and the definition would refer only to different *kinds* of purchasers, to purchasers located in different areas, to different quantities or grades, and to different conditions of sale. We see no justification for judicially deleting the words "purchasers or," or for holding that the words "different purchasers" do not mean what they say.

It has been urged in support of appellant's position that if the words "different purchasers" do mean what they say, they cover all possible ground and the remainder of the definition, which refers to different *kinds* of purchasers, etc., becomes a mere collection of illustrations or examples of "different purchasers." Even if this were true it would not be important. A reading which makes certain words illustrations or examples of other words does no such violence to a document as a reading which requires that certain words be eliminated or ignored. It is more in accordance with tradition and sense to construe a document as explaining what it says than as saying what it does not mean. However, the words "different purchasers" do not in fact cover, by any means, all the ground which the definition covers. On the contrary, if the definition stopped immediately after the words "different purchasers" it would be incomplete and absurd. For the only purchasers who would then be in any "class" would, apparently, be those purchasers as to whom a particular dealer had, in March 1942, adopted a "practice" of "setting different prices." Since all after-acquired customers, and also all old customers as to whom no such practice was in force in March 1942, would be in no "class," and since the Maximum Price Regulation is expressed in terms of "class," it follows that a dealer would be free, under the suggested short definition, to raise his prices without limit to all such customers. The final portion of the actual definition therefore remains very important when the phrase "different purchasers" has been given its full meaning.

Again, it has been urged that low rates to favored customers should disappear because the competitive conditions which produced them have disappeared. As an economic argument, this attacks the whole theory and purpose of price regulation, which are to prevent changes in competitive conditions from producing the price increases which they would produce in the absence of regulation. As a legal argument, it conflicts with Maximum Price Regulation 165. A purchaser may change from wholesaler to retailer, for example; but no one can change from a purchaser who did to one who did not, in March 1942, regularly pay "different prices" from other purchasers. Accordingly, classification on the one basis may change but classification on the other basis cannot. When members

---

[1] 7 Fed.Reg. 4734, 4737, June 25, 1942. Italics supplied.

[2] Bowles, Adm'r. v. Nu Way Laundry Co., 10 Cir., 144 F.2d 741.

of one class of purchasers change into another class the maximum price of the new class is applicable to them; but a mere change in the competitive or other conditions which led to a purchaser's getting into a given class does not, so long as he remains in the "same class," carry with it any change in the applicable maximum price.

Shortly after the Regulation was issued, the Administrator published Maximum Price Regulation No. 165, Manual No. 2, in which he said (p. 21): "Whether one class of customer is or is not the same as another class depends principally on your own business practice. If you customarily recognized one class as differing from another by charging different prices, you will be required to continue treating them as different classes." Again, on September 22, 1942, the Administrator issued the following official statement: "Frequently, of course, a seller may have had the practice of giving a customer special low prices with the complete absence of any criteria which can be objectively applied * * *. In such a case, this buyer is in a separate class by himself; his class was established by the seller's practice of giving him a lower price."[3] Appellant could not reasonably have relied, and makes no claim to have relied, on interpretations of the *General* Maximum Price Regulation which were expressed in terms of the sale of *goods* and were contained in a Bulletin published in May, 1942, before Maximum Price Regulation 165 had been issued.

Though the definition, and therefore the Regulation, were clear on analysis, they may have been somewhat ambiguous on casual reading, in the limited sense that some casual readers might overlook the words "different purchasers." But this does not aid appellant. The fact that a casual reader may eliminate words from a document does not justify a court in doing so. Moreover, on August 26 and again

on November 16, 1943, the Office of Price Administration expressly told appellant[4] that its price increases were in violation of the Regulation. Appellant nevertheless continued to violate the Regulation and was still violating it when appellee filed this suit in January, 1944. Appellant does not even contend that its violation was due to any doubt or misapprehension on its part as to the meaning which the Office of Price Administration intended the Regulation to convey. It relies entirely on the erroneous contention that the Regulation did not in fact convey the meaning which appellee has attributed to it.

Affirmed.

GRONER, C. J., (concurring).

I am far from thinking that Section 1499.102(10) of Maximum Price Regulation No. 165 is as clear as a bell. But it *is* clear that a year before this proceeding was begun the Administrator removed the uncertainties in the original by an "official interpretation,"[1] from which it clearly appears that the words "purchaser of the same class" should not include persons purchasing the same kind and quality of work on a different *price basis*—in short, that a difference in the price charged, equally with any other factor, constituted a separate price "class". Appellant was thereafter given actual notice of this, but, as it admits, "refused to concede" that its price changes had been in violation of the Act, or that the later "official interpretation" was consistent with the regulation. The case is not therefore one in which a party acted in innocent confusion, but rather one in which, with deliberate awareness of the conflict, it elected to submit its rights to the decision of the court. In such a case it is our duty to let the chips lie where they fall. Nevertheless, I think it would have been fairer and far better, from the standpoint of law enforcement, if the Adminis-

---

[3] Office of Price Administration Service, p. 11:968.

[4] In July 1943, an O.P.A. inspector erroneously told appellant that its price increases were lawful. But appellant made the increases before it got this erroneous advice, and continued them in effect after it got correct advice. It is therefore clear that the increases were not due to the erroneous advice. Appellant does not suggest that its conduct was influenced, at any time, by any advice from the Office of Price Administration. Moreover the inspector had no power to bind the Office of

Price Administration. Revised Procedural Regulation No. 1, §§ 1300.51-1300.52, 7 Fed.Reg. 8961, 8965, amended 8 Fed.Reg. 3313; cf. Nichols & Co. v. Secretary of Agriculture, 1 Cir., 131 F.2d 651, 658, 659, reversed on other grounds, 136 F.2d 503.

[1] O.P.A. Service, 11:969; Sept. 22, 1942: "Thus if a laundry customarily charged two customers different prices at the same time the two customers are in a separate class even if one customer sometimes paid more than the other and sometimes less."

trator had sought an injunction rather than the harsher penalty of triple damages. But, obviously, I cannot allow that factor to control the right of the question in hand.

ARNOLD, Associate Justice (dissenting).

If this were an ordinary case for interpretation of an administrative regulation I should feel inclined to follow the majority opinion. That opinion adopts the interpretation put on an admittedly ambiguous regulation by the administrative body which had the duty of enforcing it. Ordinarily such an administrative interpretation should be followed by the court even though a contrary interpretation of the regulation is equally reasonable and plausible.

But this is not an ordinary case. The statute as it existed at the time of the transactions here was a peculiar one. It put an extreme hazard upon the small merchant.* It made any person who violated a price regulation absolutely liable for three times the total of his overcharges regardless of his good faith in attempting to comply with the regulation.[1] In such a situation where liability is imposed without fault a different principle of construction should control. Regulations which subject persons to such hazards should be free from ambiguity. Where ambiguities exist under these circumstances they should be construed in favor of the persons who attempt in good faith to comply with the regulation.

Every reason of morals and fair dealing between a government and its citizens favors a strict construction of those unusual regulations imposing liability regardless of actual fault. A contrary rule would turn every ambiguity created by an administrative agency into a dangerous trap. Furthermore, whether the administrative agency chooses to spring such a trap becomes a matter of the whim of the particular enforcing officer. This is illustrated by the enforcement of the very regulation we are interpreting here. In the case of Bowles v. Nu Way Laundry Company[2] a seller who had violated this same regulation in many different ways and whose attitude was described by the court as one of "recalcitrant noncompliance" was merely enjoined not to repeat his offense. No penalties, were demanded by the Office of Price Administration. In the case before us there is no suggestion of lack of good faith in the record. For a part of the time for which treble penalties are sought appellant had been actually informed by an Office of Price Administration representative that his price policies were correct. Yet appellant is assessed treble damages because it followed a plausible interpretation of a regulation which the majority itself admits is ambiguous.

The concurring opinion attempts to justify this hardship by saying that the Administrator removed the uncertainty by an official interpretation of the regulation. This sounds simple and just until one examines how it actually works out. When we turn to the so-called "Official Interpretations" we find not one but three sets of interpretations. One is a manual bearing the reassuring title "What Every Retailer Should Know About the General Maximum Price Regulation". A second manual is entitled "How The Service Price Regulation Applies To The Service Trades". These two interpretations are in handy . form. They are the kind of pamphlets which the retailer might be expected to use. Then, in addition to these manuals, there is a loose leaf service for more profound students. It is entitled "General Maximum Price Regulations—Interpretations". It is a continuing selection and digest of the hundreds of thousands of field decisions compiled by the Office of General Counsel with its comment. Like the brook, this service runs on forever, constantly increasing in volume as cases are decided in the field. All three of these publications are issued by the Office of Price Administration; each is as official as the other.

The ruling of the majority is that the small retailer cannot rely on the wording of the regulations. He must at the peril of treble damages also keep up with all three of these publications. If he fails to do so he becomes liable at the whim of the administrative officer for three times the cost of his mistake. The harsh character of such a rule is emphasized by the fact that the record here shows even the employees of the Office of Price Administration are unable to keep up with all this interpretative literature. In this very case

---

* I emphasize the hardship on the small businessman, because the large concern can afford the expert services which minimize this kind of risk.

[1] Bowles v. Franceschini, 1 Cir.1944, 145 F.2d 510.

[2] 10 Cir.1944, 144 F.2d 741.

a subordinate official informed appellant that its interpretation of the regulation was correct. This did not bind the Office of Price Administration as a matter of law. It merely shows that the regulation was so ambiguous that an official sent out by the Office of Price Administration was unable to interpret it correctly. And it emphasizes the harsh injustice of the majority in penalizing a small business concern treble damages for a mistake made in good faith. In effect, the majority's rule of construction levies a substantial fine for the offense of not knowing more about the maze of current interpretations than the expert who examined and approved the prices.

I had always thought that judicial review of administrative decisions was a protection against this sort of arbitrary administrative injustice. For that reason it is difficult for me to imagine why this court refuses to apply the rule that, in the unusual case where a retailer is liable at his peril for misconstruing a regulation, ambiguities in such a regulation should be construed in his favor.

In this unusual situation no other rule of construction is fair to the small merchant who cannot afford the expert service necessary to guide him through the maze of administrative interpretation. For example, suppose that the appellant here had read and analyzed all of the interpretative publications issued by the Office of Price Administration. Even then it is doubtful if it could have escaped a treble penalty for the overcharges which an Office of Price Administration official had told it were correct prices. It would have found in the pamphlet with the reassuring title "What Every Retailer Should Know About the General Maximum Price Regulation" the following statement:

"A retailer who, on and after May 18, sells goods which are the *same* as those he delivered during March is bound by his highest March prices. That is, he cannot charge more than the highest price charged *by him* for the same goods during March. Some customers may not have paid as much as other customers on deliveries made during March, but the retailer is entitled to charge all his customers the highest price charged to any customer for such goods during that period.

"However, if lower prices or discounts were normally allowed for large quantities or for special classes of customers or under different conditions of sale, these must be continued after May 18. The mere fact that a retailer may have sold merchandise to a particular customer during March at a price lower than the price he charged other customers does not necessarily make that purchaser a separate class of purchaser. Thus, if a retailer charged all his customers a certain price in March, but in order to induce a particular customer to buy some merchandise he sold it to him at a lower price, he is not required to continue to sell to such customer at a lower price." Gen. Max. Price Reg. Bulletin No. 2 (May, 1942), p. 3.

This statement affirmatively supports appellant's practice. It exactly covers appellant's case because it says that if it sells to some of its customers at a lower price in order to induce them to buy it need not continue that practice. Now suppose appellant searches the voluminous loose leaf service with its compilation of field decisions and the General Counsel's comment. This service tells appellant that the regulation is intended to establish two kinds of classes, one subjective and the other objective.[3] It goes on to say that one of the subjective classes is a single person with exceptional "ability to haggle" and that such a customer remains in that class even after his ability to haggle is gone. All

---

[3] "Frequently, of course, a seller may have had the practice of giving a customer special low prices with the complete absence of any criteria which can be objectively applied. Thus a seller may have customarily given one customer—who by all objective tests was exactly like many other customers—a special low price out of friendship, or habit, or whim, or because the particular customer was exceptionally good at haggling. In such a case, this buyer is in a separate class by himself; his class was established by the seller's practice of giving him a lower price. However, because the criterion (friendship, habit, whim, ability to haggle, etc.) is one which can not be objectively applied or duplicated and depends primarily on the seller's emotions, the class is 'non-admissible.' Other persons need not be admitted to the class, even though they claim, for example, to be as good friends of the seller as the favored buyer. The criterion of friendship is not one which OPA can be expected to apply. By the same token, however, OPA can not be expected to pass upon the disappearance of the subjective criterion. The 'friend' is in a separate

of this is clear enough on its face though the appellant may wonder how the terms "subjective" and "objective" can be imported into the regulation without amendment. Nevertheless, this interpretation does not repeal the interpretation in "What Every Retailer Should Know About the General Maximum Price Regulation". There it appears that if a retailer *in order to induce a particular customer to buy some merchandise* sold it to him at a lower price he is not required to continue to sell such customer at a lower price. This is just as official as the General Counsel's interpretation. It is reinforced by the language of the other manual "How The Service Price Regulation Applies To The Service Trades". When we reconcile these three official interpretations we find that if appellant charged low prices to particular customers in March, 1942, to induce those particular customers to buy, it may escape treble damages. If, however, these lower prices were the result of the customer's *ability to haggle* appellant has unwittingly made a subjective classification and must pay a treble penalty for not being sufficiently introspective to realize it.

The concurring opinion avoids this dilemma by assuming without supporting reasons that the official interpretations in the official manuals are less official than those made by the General Counsel and, therefore, need not be reconciled. I am not complaining about that because I believe that the ingenuity of the majority would be sufficient to reconcile the two sets of interpretations with its opinion if it used the necessary time and patience. My complaint is with the principle of construction that penalizes a small retailer because he has not the requisite training to erect such an elaborate logical edifice.

I, therefore, insist that the power to assess involuntary penalties should be so construed as to create the obligation on the part of the administrative body not to write ambiguous regulations. It is true that

eventually the Office of Price Administration got around to repudiating the advice of its subordinate official that appellant's prices were correct. It finally instructed appellant in the mysteries of subjective classes containing only a single person. But even for that portion of the time why should appellant be charged three times its alleged overcharge for the privilege of having a court decide a highly ambiguous case? I am unable to answer that question and the majority opinion does not attempt to do so.

It would seem that good faith and good administrative practice would require the Office of Price Administration to amend its regulation so that it was clear what it meant before it demanded treble damages. The Office of Price Administration subsequent to this case actually did amend the regulation so that today its meaning is clear without recourse to interpretative services.

The original definition which we are construing here read as follows:[4]

" 'Purchaser of the same class' refers to the practice adopted by the seller in setting different prices for services for sales to different purchasers or kinds of purchasers (for example, wholesaler, jobber, retailer, government agency, public institution, individual consumer) or for purchasers located in different areas or for different quantities or grades or under different conditions of sale."

The subsequent amendment removing the superfluous, misleading and ambiguous words now reads:[5]

"(10) 'Purchaser of the same class' means a purchaser belonging to the same price class, that is, to a group of purchasers to whom it was your established practice in March 1942 to supply or offer to supply the same service at a particular price. If in March 1942 you customarily supplied or offered to supply the same service to any purchaser at a price different from the price at which you supplied or offered to supply the same service to all other pur-

---

class and entitled to a lower price even though amicability disappears and the 'friends' come to blows. (Of course, the seller can always refuse to sell to his 'friend' at any price.) Fundamentally, the one criterion capable of objective delineation and application was that this particular seller did customarily get a lower price, and it is this criterion which must be continued.

"Accordingly, a view, sometimes expressed, that classes can be established only if a 'business reason' exists for the classification is not well founded." Office of Price Administration Service, 11:968 and 969.

[4] Maximum Price Regulation No. 165, Sec. 1499.116(a) (10), 7 Fed.Reg. 4734 (1942).

[5] 9 Fed.Reg. 7443 (1944).

chasers, that purchaser is in a purchaser price class by himself."

The very fact that an amendment was made by the Office of Price Administration is evidence that it felt that an amendment rather than an interpretation was necessary. Yet the majority lays down a principle which imposes a penalty on a small businessman because he was unable to see in the original regulation the dim outlines of the later amendment.

This case has no significance in the present administration of price regulations. The amended act in force today does not impose penalties regardless of the good faith of the seller.[6] Under such a statute the rule of construction laid down by this court would cause no hardship since the clearing up of ambiguities by subsequent administrative interpretation no longer requires the court to assess retroactive penalties. This case is only important as an instance where an obsession for rigid, grammatical construction has won out over sense of equity and fair dealing between a government and its citizens.

Recently this court, following the same attitude of disregard for the equities of the situation before it, held that an injunction was mandatory in a case where a price regulation had been violated regardless of the seller's good faith and his honest attempt to comply.[7] This result was reversed by the Supreme Court of the United States.[8] The facts of that case are different from the one before us. Yet to my mind it represents a policy of fair dealing which the majority has disregarded here. One of the purposes of judicial review of administrative decisions is to obtain final interpretations of law and regulations. But another and equally important purpose is to insure fairness of administrative action. It is this second purpose which has been lost sight of in the majority opinion.

On Appellee's Motion to Vacate Judgment
June 18, 1945.

PER CURIAM.

■■ On May 28, 1945, we affirmed a judgment of the District Court which awarded the Administrator three times the amount which appellant was adjudged to have overcharged its customers. Both appellant and the Administrator had argued the appeal on the. theory that it involved only one question, namely, whether appellant had violated Regulation 165. But the Administrator now points out that the Stabilization Extension Act of 1944, passed while this appeal was pending, limits recovery to the amount of overcharges or $25, whichever is greater, if the defendant proves that his violation of a regulation "was neither wilfull nor the result of failure to take practicable precautions against the occurrence of the violation."[1] The Administrator asks that we vacate our judgment and remand the case to the District Court in order to permit appellant to establish, if it can, the statutory partial defense. The propriety of this course has been established in other circuits.[2] An order will therefore be entered vacating our former judgment and remanding the case to the District Court for further proceedings. While we cannot anticipate the evidence, we think it proper to say that in our opinion (1) Regulation 165 was capable of being honestly and reasonably understood in the sense for which appellant contends, and (2) if appellant, after taking all "practicable precautions" to understand the Regulation, honestly disagreed with what appellant knew to be the Administrator's interpretation, and acted in accordance with appellant's different interpretation in order that the question might be judicially decided, appellant was not a "wilfull" violator of the Regulation.[3]

Judgment vacated and cause remanded.

---

[6] Stabilization Extension Act of 1944, § 108, 58 Stat. 640, 50 U.S.C.A.Appendix, § 925(b, c).

[7] Brown v. Hecht Co., 1943, 78 U.S.App. D.C. 98, 137 F.2d 689.

[8] Hecht Co. v. Bowles, 1944, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754.

[1] Tit. I, § 108 (b), 58 Stat. 640, 50 U.S. C.A.Appendix, § 925 (e); made applicable to pending proceedings, Tit. I, § 108 (c), 50 U.S.C.A.Appendix, § 925 note.

[2] Bowles v. Franceschini, 1 Cir., 145 F. 2d 510; Bowles v. Glick Bros. Lumber

Co., 9 Cir., 146 F.2d 566; Speten v. Bowles, 8 Cir., 146 F.2d 602; Bowles v. Hasting, 5 Cir., 146 F.2d 94.

[3] Cf. Felton v. United States, 1 Cir., 96 U.S. 699, 24 L.Ed. 875; United States v. Murdock, 290 U.S. 389, 54 S.Ct. 223, 78 L.Ed. 381; State of California v. Latimer, 305 U.S. 255, 261, 59 S.Ct. 166, 83 L.Ed. 159; Spies v. United States, 317 U.S. 492, 496, 63 S.Ct. 364, 87 L.Ed. 418; Commissioner of Internal Revenue v. Clarion Oil Co., — U.S.App.D.C. —, 148 F. 2d 671.