KIYOSHI OKAMOTO et al. v. UNITED STATES, and six other cases.

Nos. 3076–3082.

Circuit Court of Appeals, Tenth Circuit.

Dec. 26, 1945.

Dissenting Opinion Jan. 7, 1946.

HUXMAN, Circuit Judge, dissenting in part.

A. L. Wirin, of Los Angeles, Cal. (J. B. Tietz, of Los Angeles, Cal., and L. C. Sampson, of Cheyenne, Wyo., on the brief), for appellants.

Carl L. Sackett, U. S. Atty., of Cheyenne, Wyo. (John C. Pickett, Asst. U. S. Atty., of Cheyenne, Wyo., on the brief), for appellee.

Before BRATTON, HUXMAN, and MURRAH, Circuit Judges.

BRATTON, Circuit Judge.

Section 11 of the Selective Service Act of 1940, 54 Stat. 885, 50 U.S.C.A.Appendix § 311, imposes a criminal sanction on any person who knowingly makes or is a party to the making of any false registration, who knowingly makes or is a party to the making of any false statement as to his or another's fitness or liability for service, who knowingly counsels, aids, or abets another to evade registration or service, who knowingly fails or neglects to perform any duty required of him by the Act, who knowingly hinders or interferes by force or violence with the administration of the Act, or who conspires so to do.

By indictment returned in the United States Court for Wyoming, Kiyoshi Okamoto, Paul Takeo Nakadate, Tsutomu Wa-

kaye, Frank Seishi Emi, Minoru Tamesa, Isamu Horino, Guntaro Kubota, and James Matsumoto Omura were charged with entering into a conspiracy with each other and with divers other persons to evade the requirements of the Act, and to counsel and abet themselves and others who had registered under the Act and who were not yet inducted into the land or naval forces of the United States to evade service in such forces. The defendant James Matsumoto Omura was acquitted. The other defendants were found guilty, four were sentenced to terms of imprisonment of four years each, and three to terms of two years each.

■ The sufficiency of the evidence to sustain the convictions is challenged. Following the attack on our naval base at Pearl Harbor and our declaration of war against Japan, many Japanese aliens and American citizens of Japanese descent were evacuated from their homes in the Pacific coastal area and placed in war relocation centers. The appellant Kubota was born in Japan and the other appellants were American born citizens of Japanese ancestry. They were evacuated from their homes in the Pacific Coastal region and placed in a relocation center at Heart Mountain, Wyoming. An organization called the Fair Play Committee, hereinafter referred to as the Committee, was formed at the relocation center. Its membership was limited to citizens of the United States, and apparently its original purpose was to air grievances, improve the lot of the evacuees, and test the constitutionality of the evacuation. All the appellants except Kubota were members of the Committee, and most of them were officers of it. Sometime after the inception of the Committee, the appellants and others of like status were reclassified under the Selective Service Act and made eligible for service in the armed forces. The Committee thereupon inaugurated an active program relating to that matter, and each of the appellants took an active part in it. Funds were raised, meetings were held, addresses were delivered, letters were written, bulletins were published and circulated, and publicity was prepared for publication and was published in the Rocky Shimpo, a newspaper published by the defendant Omura in Denver, Colo. Much said in the address, bulletins, and publications was to the effect that because of the uncertainty of their status, those at the relocation center who had been thus reclassified were not subject to the provisions of the Selective Service Act; that their evacuation and detention constituted a wrongful violation of law; that clarification of their status was desired before being inducted into the armed forces; and that they were willing to enter the armed service as soon as the wrong done them was corrected and they were restored to their rights as citizens. A test case in court to determine their status and vindicate their rights was discussed, and correction by Congressional pronouncement was mentioned. But the activities of the members of the Committee did not end there. At a largely attended meeting, it was decided by unanimous vote that until their status had been clarified and their rights restored, they would refuse to submit to physical examination or report for induction when called for service. And the action thus taken was given publicity by a bulletin circulated at the center in which it was stated, "We, Members of the Fair Play Committee Hereby Refuse to Go to the Physical Examination or to the Induction If or When We are Called in Order to Contest the Issue * * * We hope that all persons whose ideals and interests are with us do all they can to help us. We may have to engage in court actions, but as such actions require large sums of money, we do need financial support and when the time comes, we hope that you will back us up to the limit." Thereafter more than sixty persons detained at the relocation center, including some of the appellants, disobeyed orders of the draft board to report for preinduction physical examination or orders to report for induction into the armed forces. One of the appellants stated in a letter, "The other Centers are ahead of us in the movement against the draft * * *." Another appellant stated on one occasion that he did not know whether the United States should resist the Japanese government in the war effort; that he professed loyalty to the United States but could not believe whether it was doing right or wrong; and that he had not come to a conclusion yet as to whether he believed in the cause of the United States in the war with Japan. A third appellant stated on one occasion that he was not willing to go into the army. And a fourth appellant stated that he would rather go to the penitentiary than report when called by his draft board. Manifestly the evidence, together with the permissible infer-

ences fairly to be drawn from it, presented an issue of fact for the jury as to whether the statements, acts and conduct of the appellants, considered in their totality, were honest objections directed in good faith against that which was believed to be wrongs, or constituted convincing evidence of a concert of understanding and purpose to evade the Selective Service Act themselves and to aid and abet others in doing so. It cannot be said that the evidence was insufficient to support the verdict and judgments.

■■ The further contention is that the convictions denied to appellants their rights of freedom of speech, press, and assemblage, guaranteed by the First Amendment. The Act, supra, was enacted into law at a time when most of the world was at war. Realizing the danger of our becoming involved in the war, Congress recognized the urgent necessity of integrating our forces for national defense, and the Act was passed for the purpose of mobilizing our national manpower. By its terms a comprehensive system was established intended to operate as a process for the selection of men for service in our armed forces. And in furtherance of that legislative purpose, section 11 was inserted making it a penal offensé to violate certain provisions in the Act, or to conspire together for that purpose. Freedom of speech, freedom of the press, and freedom of assembly guaranteed by the First Amendment are fundamental rights. But, though fundamental, they are not in their nature absolute. These rights are not unbridled license to speak, publish, or assemble without any responsibility whatever. Their exercise is subject to reasonable restriction required in order to protect the Government from destruction or serious injury. The delicate and difficult question usually presented is whether speech, press and assembly are of such nature as would produce, or are calculated to produce, a clear, present, and imminent danger of a substantive evil which Congress has the constitutional power to prevent. Schenck v. United States, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470; Hartzel v. United States, 322 U.S. 680, 64 S.Ct. 1233, 88 L.Ed. 1534. Ordinarily "the substantive evil must be extremely serious and the degree of imminence extremely high" in order to warrant punishment for the exercise of speech, press, or assembly. Bridges v. California, 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192; Thomas v. Collins, 323 U.S. 516, 65 S.Ct.

315. But the First Amendment in its full sweep does not protect one in speech, publication, or assembly in furtherance of a conspiracy to promote evasion of an act reasonably designed to protect the Government against destruction by military force. Cf. Schenck v. United States, supra.

■■ The remaining contention which merits discussion concerns itself with the denial of a requested instruction and the giving of an instruction. The appellants tendered to the court a requested instruction, the substance of which was that in determining whether the appellants acted in good faith or bad faith, the jury might take into consideration their sincerity or insincerity of belief that the status and rights of American citizens of Japanese descent, evacuated from their homes and detained in the relocation center, could be lawfully determined or clarified by the courts upon refusal of such persons to comply with the orders of the draft board and upon criminal prosecution for such refusal; and that if the jury should find that the appellants sincerely and in good faith entertained such belief, and that all of their pertinent acts and conduct were based upon such belief a verdict of acquittal should be returned. The court refused the tendered instruction and instructed the jury in this language: "They took the position that a test case should be filed, having for its purpose a test of the constitutionality of the selective training and service act as applied to them while detained in a relocation center. In this connection you are instructed that a desire to have a test case for that purpose does not excuse failure to comply with the selective training and service act. * * * The selective training and service act provides that it is a violation of the law for anyone to counsel another to disobey the draft law or to assist or abet one to evade the draft law. And I charge you that it is a violation of the law, even though it is contended that the purpose was to create a case for the testing of the constitutionality of the law."

The indictment in Keegan v. United States, 325 U.S. 478, 65 S.Ct. 1203, 1207, charged a conspiracy to counsel divers persons to evade, resist, and refuse service in the land and naval forces, in violation of section 11, supra. The defendants there were members of an organization called the Bund. Its professed purpose was to keep alive the German spirit among persons of German blood in the United States. Par-

ticular objection was directed against section 8(i) of the Selective Service Act, supra, 50 U.S.C.A.Appendix § 308(i) which declared it to be the expressed policy of the Congress that vacancies in the employment rolls of business or industry caused by the induction of employees into the armed forces under the provisions of the Act should not be filled by members of the Bund. The evidence disclosed among other things that by a document called Bund Command No. 37, it was stated in effect that every man, if he could, would refuse to do military duty until that section of the act and all other laws which confined the rights of members of the organization were revoked. Broadly stated, the facts there were fairly comparable to those presented here. It was contended by the Government there that the honesty and bona fides of the defendants was immaterial, and further that whether they desired to test the constitutionality of the law was likewise of no decisive moment. But the court did not share that view. The court said, "But to counsel merely refusal is not made criminal by the Act." And the court further said, "One with innocent motives, who honestly believes a law is unconstitutional and, therefore, not obligatory, may well counsel that the law shall not be obeyed; that its command shall be resisted until a court shall have held it valid, but this is not knowingly counseling, stealthily and by guile, to evade its command." Viewed in the light of the opinion in the Keegan case, it is clear that the trial court erred in giving the instruction to which reference has been made. In respect of the issue as to whether the appellants acted with honesty of purpose and innocence of motive in a good faith effort to bring about a test case to determine their exempt status under the Selective Service Act, the court should have instructed the jury in substantial harmony with the rule later enunciated in the Keegan case.

The United States seeks to avoid the impact of the Keegan case in its controlling application here by urging that there the judgment was reversed solely on the ground that the evidence was insufficient. It is said that there only five members of the court joined in the reversal; that four members dissented; that two of the members who joined in the reversal did so exclusively on the ground of the inadequacy of the evidence; and that therefore only three members concurred in that part of the opinion of the majority relating to the right of one to counsel in good faith and with innocent motives noncompliance with a law honestly believed to be unconstitutional and for that reason not obligatory. But a critical examination of the crucial language in the opinion of the majority and in the separate concurring opinions indicates that they fail to sustain the contention.

The judgments are severally reversed and the causes remanded.

HUXMAN, Circuit Judge (dissenting in part).

I concur in the conclusion of the majority that the trial court erred in its instruction on the issue of good faith, but I cannot agree with the majority that the evidence was sufficient to support the verdict and judgments. In my opinion the evidence was wholly insufficient to establish a conspiracy to evade the Act, or aid or abet others to do so, as the term "evade" is construed by the Supreme Court in Keegan v. United States, supra. No useful purpose would be served by analyzing in detail the evidence which leads me to this conclusion.

I would reverse and remand, with directions to dismiss.