**WARREN v. UNITED STATES.**

No. 3921.

United States Court of Appeals
Tenth Circuit.

Oct. 31, 1949.

Harrop A. Freeman, Ithaca, N. Y. (Dale Bruce, Wichita, Kan., on the brief), for appellant.

Eugene W. Davis, Asst. U. S. Atty., Topeka, Kan. (Lester Luther, U. S. Atty., and Malcolm Miller, Asst. U. S. Atty., Topeka, Kan., on the brief), for appellee.

Before PHILLIPS, Chief Judge, MURRAH, Circuit Judge, and RICE, District Judge.

PHILLIPS, Chief Judge.

Warren was indicted, tried, and convicted on an indictment which charged him with a violation of § 462(a) of the Selective Service Act of 1948,[1] 50 U.S.C.A. Appendix, §§ 451–470.

The indictment charged "that on October 23, 1948, at Wichita, in the Second Division of the District of Kansas, * * * Warren did knowingly counsel * * * Walter Dean Murrah * * * who was required by the Selective Service Act of 1948 to register for training and service in the armed forces of the United States to fail and refuse to register for service in such * * * armed forces."

The evidence established these facts: Murrah became 18 years of age on October 20, 1948. He lived with Warren, who is his stepfather, in Wichita, Kansas. Shortly before October 20, 1948, Warren advised, counseled, and urged Murrah not to register as required by the Act and suggested that Murrah, with funds provided by Warren, either go to Canada or Mexico. Murrah rejected Warren's counsel and duly registered. Warren testified that he is a practicing physician; that he is a member of the Unitarian Church; that he felt that Murrah and others should not comply with the Act; that he believed war to be a great evil; that without compulsory military training, war could not be carried on and that war could be prevented if the

---

**1.** Hereinafter called the Act.

Act could not be enforced; that he believed certain laws are detrimental to man as a whole and, therefore, should be disobeyed; that from time to time he undertook to instruct Murrah with respect to moral, social, and religious matters in accordance with his beliefs, and admitted that he advised Murrah not to register and told Murrah if he did not register and would go to Canada, he would pay the expenses incurred by Murrah in so doing.

By § 1 of Title I of the Act, Congress declared: " * * * that an adequate armed strength must be achieved and maintained to insure the security of this Nation", and " * * * that it is essential that the strength and organization of the National Guard, both Ground and Air, as an integral part of the first line defenses of this Nation, be at all time maintained and assured", and "To this end, it is the intent of the Congress that whenever Congress shall determine that units and organizations are needed for the national security in excess of those of the Regular components of the Ground Forces and the Air Forces, and those in active service under this title, the National Guard of the United States, both Ground and Air, or such part thereof as may be necessary, together with such units of the Reserve components as are necessary for a balanced force, shall be ordered to active Federal service and continued therein so long as such necessity exists."

Section 3 of Title I of the Act in part provides: " * * * it shall be the duty of every male citizen of the United States, and every other male person residing in the United States, who, on the day or days fixed for the first or any subsequent registration, is between the ages of eighteen and twenty-six, to present himself for and submit to registration at such time or times and place or places, and in such manner, as shall be determined by proclamation of the President and by rules and regulations prescribed hereunder."

Section 12(a) of Title I in part provides: " * * * any person * * * who knowingly counsels, aids, or abets another to refuse or evade registration or service in the armed forces or any of the requirements of this title * * * shall, upon conviction * * * be punished by imprisonment for not more than five years or a fine of not more than $10,000, or by both such fine and imprisonment * * *."

■ Section 12(a) also defines in the disjunctive nine other offenses, six of which precede and three of which follow the definition of the offense set out above. A single penalty provision prescribes the same punishment for each of the defined offenses. Courts should interpret a statute in accordance with its dominant purpose; particular provisions should be read in the light of their context and if the words fairly permit, they should be given an interpretation that will carry out the manifest legislative policy.[2] Here, the manifest legislative policy was to make effective the requirement of registration and service in the armed forces. We believe Congress intended that counseling, aiding, or abetting another to refuse or evade registration or service in the armed forces should be a primary and not an accessorial offense and that it should not be essential to consummate the offense that the person counseled, aided, or abetted should refuse or evade registration or service in the armed forces. Construed otherwise, the provision would be identical in its effect with the general aider and abettor statute, 18 U.S.C.A. § 550 [now § 2], and would serve no useful purpose.

Warren asserts that because he believed war to be wrong, and registration, since it is in aid of war, likewise wrong, he had the right to counsel Murrah, with whom he stood in the relation of loco parentis, to evade and refuse registration. He predicates his contention on the rights of freedom of religion and freedom of speech secured by the First Amendment to the Constitution of the United States.

■ The constitutional power of Congress to raise armies necessarily connotes

2. Securities and Exchange Commission v. C. M. Joiner Leasing Corporation, 320 U.S. 344, 350–351, 64 S.Ct. 120, 88 L. Ed. 88.

the like power to say who shall serve in them and in what way.[3]

■ Under the war power, Congress may provide for conscription into combatant military service those who are conscientiously opposed to participation in war. Who shall be exempt from service in the armed forces is dependent upon the will of Congress and not upon the religious scruples of the individual, except as Congress may provide.[4]

■ Congress has power to raise armies by conscription in time of peace as well as in time of war.[5] The power to do so is essential to the national security. We must accept as true the recitals of Congress in the Act. Moreover, we can take judicial notice that when the Act was passed, the balance between peace and war was so delicate that no one could forecast the future with certainty and that our national security required the maintenance of adequate military, air, and naval establishments and that, without such establishments, our survival as a nation of free and independent people would be in jeopardy. Congress has power to prepare against an enemy, actual or potential. It is not required to postpone that preparation until a time when it would be too late.

■ Freedom of religion and freedom of speech, guaranteed by the First Amendment, with respect to acts and utterances calculated to interfere with the power of Congress to provide for the common defense and to insure the survival of the nation are qualified freedoms.[6] They may not be construed so as to prevent legislation necessary for national security, indeed, that may be necessary to our survival as a nation.

"* * * the constitutional guaranties of personal liberty are not always absolutes. Government has a right to survive and powers conferred upon it are not necessarily set at naught by the express prohibitions of the Bill of Rights. It may make war and raise armies. To that end it may compel citizens to give military service * * * and subject them to military training despite their religious objections." [7]

■ We hold that the provisions of the Act requiring registration by persons within the designated classes and the provisions thereof to make that requirement effective were enacted in the valid exercise of the power of Congress to raise armies.

Warren asserts that if the registration requirement of the Act be valid, nevertheless, since he stood in the relation of loco parentis to Murrah, he had the right and duty to give Murrah religious training and instruction and in good faith teach him that war is wrong and that registration, since it is in aid of war, is likewise wrong. That much we may concede. But since Congress had the constitutional power to enact laws requiring registration and to make that requirement effective, Warren could not, under the protection of the First Amendment, counsel and urge Murrah to refuse or evade registration. It is one thing for a person to entertain religious beliefs, to express those beliefs, and to teach them to his children. It is another thing to counsel and urge violation of valid penal legislation. "Freedom of conscience and freedom to adhere to such religious organization or form of worship as the individual may choose cannot be restricted by law. On the other hand, it safeguards

3. United States v. MacIntosh, 283 U.S. 605, 622, 51 S.Ct. 570, 75 L.Ed. 1302.

4. United States v. MacIntosh, 283 U.S. 605, 623, 51 S.Ct. 570, 75 L.Ed. 1302; Weightman v. United States, 1 Cir., 142 F.2d 188, 191; Roodenko v. United States, 10 Cir., 147 F.2d 752, 753–754; Kramer v. United States, 6 Cir., 147 F. 2d 756, 759.

5. United States v. Lambert, 3 Cir., 123 F.2d 395, .396; United States v. Garst, D.C.Pa., 39 F.Supp. 367; United States v. Cornell, D.C.Idaho, 36 F.Supp. 81, 84.

6. United States v. MacIntosh, 283 U.S. 605, 622–624, 51 S.Ct. 570, 75 L.Ed. 1302.

7. Dissenting opinion of the late Mr. Justice Stone in Minersville School District v. Gobitis, 310 U.S. 586, 602, 60 S.Ct. 1010, 1016, 84 L.Ed. 1375, 127 A.L.R. 1493.

the free exercise of the chosen form of religion. Thus the Amendment embraces two concepts,—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society." [8]

■ "Laws are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices." A man may not excuse his practices that are contrary to law because of his religious belief. "To permit this would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself. Government could exist only in name under such circumstances." [9] "Religious faiths, honestly held, do not free individuals from responsibility to conduct themselves obediently to laws which are * * * imperatively necessary to protect society as a whole from grave and pressingly immient dangers * * *." [10]

The langauge of the Supreme Court in United States v. MacIntosh, 283 U.S. 605, 625, 51 S.Ct. 570, 575, 75 L.Ed. 1302, is apposite: "When he speaks of putting his allegiance to the will of God above his allegiance to the government, it is evident, in the light of his entire statement, that he means to make his own interpretation of the will of God the decisive test which shall conclude the government and stay its hand. We are a Christian people, Holy Trinity Church v. United States, 143 U.S. 457, 470–471, 12 S.Ct. 511, 36 L.Ed. 226, according to one another the equal right of religious freedom, and acknowledging with reverence the duty of obedience to the will of God. But, also, we are a nation with the duty to survive; a nation whose Constitution contemplates war as well as peace; whose government must go forward upon the assumption, and safely can proceed upon no other, that unqualified allegiance to the nation and submission and obedience to the laws of the land, as well those made for war as those made for peace, are not inconsistent with the will of God."

■ It should be noted that this is not a case where one with innocent motives honestly believing a law to be unconstitutional and, therefore, not obligatory, counseled that the law should not be obeyed and that its command should be resisted until a court should hold it valid.[11] That defense was not raised. Warren testified that he was fully acquainted with the provisions of the Act at the time he counseled and endeavored to persuade Murrah not to register. He knowingly and deliberately violated one of its penal provisions under his asserted philosophy that he had the right to disobey a Federal law which he believed to be detrimental to mankind as a whole. A person may not decide for himself whether a law is good or bad and if bad, that he is free to disobey it.

■ Moreover, by counseling Murrah, Warren disobeyed the law himself. One may not disobey a law even in the good faith belief that it is unconstitutional and, on that ground, avoid the consequences of his act if the law is within the constitutional power of Congress.

■ The contention that the evidence failed to establish criminal intent is without merit. Warren admitted that he deliberately and intentionally violated the Act.

■ The indictment charged the offense in substantially the language of the statute and with sufficient particularity to enable Warren to know exactly what he had to meet, to give him a fair and reasonable opportunity to prepare his defense and to avail himself of a conviction or

8. Cantwell v. Connecticut, 310 U.S. 296, 303, 304, 60 S.Ct. 900, 903, 84 L.Ed. 1213, 128 A.L.R. 1352.

9. Reynolds v. United States, 98 U.S. 145, 166–167, 25 L.Ed. 244.

10. Concurring opinion of Mr. Justice Black and Mr. Justice Douglas in West Virginia State Board of Education v. Barnette, 319 U.S. 624, 643, 63 S.Ct. 1178, 1188, 87 L.Ed. 1628, 147 A.L.R. 674.

11. Cf. Keegan v. United States, 325 U. S. 478, 493, 65 S.Ct. 1203, 89 L.Ed. 1745, and Kiyoshi Okamota v. United States, 10 Cir., 152 F.2d 905, 907.

acquittal as a bar to future prosecution for the same offense. It was sufficient under settled rules of criminal pleading.[12]

Affirmed.

---

12. United States v. Crummer, 10 Cir., 151 F.2d 958, 963; Hagner v. United States, 285 U.S. 427, 431, 52 S.Ct. 417, 76 L.Ed. 861.