**UNITED STATES of America,**
**Appellee,**

v.

**Richard Mather BOARDMAN, Defendant,**
**Appellant.**

**No. 7355.**

United States Court of Appeals
First Circuit.

Dec. 11, 1969.

Certiorari Denied March 23, 1970.
See 90 S.Ct. 1124.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

COFFIN, Circuit Judge.

Defendant was convicted in the court below of failing to report for civilian work in the national interest in violation of 50 U.S.C. App. §§ 456(j), 462. Defendant concedes that he knowingly failed to obey an order of his local board, and that the order was issued in compliance with statute and regulations. His appeal raises issues concerning the free exercise of religion, the intent requisite for conviction of crime, and the division of function between judge and jury.

The record indicates that both defendant and the Selective Service System have behaved punctiliously. Defendant was originally classified II–S while an undergraduate at Antioch College. Upon graduation, his local board placed him in class I–O, the classification reserved for those conscientiously opposed to any form of military service. In the course of completing SSS Form 152 (Special Report for Class I–O Registrants), defendant indicated that his first choice for alternate service was the Chicago branch of the American Friends Service Committee. Defendant's local board replied that the Friends Service Committee was not an acceptable alternative to military service and advised defendant to apply for work in an approved program.

By that time, however, defendant had already begun work with the Committee as an adviser to draft registrants. Several months of negotiations concerning defendant's status ensued. Defendant terminated these negotiations by a letter to his local board in which he expressed his intent to refuse to cooperate any further with the Selective Service System. This step was prompted by defendant's belief that any system of conscription is unjust and that the practice of exempting conscientious objectors was merely a device for blunting the protests of those most vehemently opposed to militarism. Defendant's local board then ordered defendant to report for ci-

William M. Kunstler, New York City, and Crystal C. Lloyd, with whom John G. Brooks, Boston, Mass., was on brief, for appellant.

Stanislaw R. J. Suchecki, Asst. U. S. Atty., with whom Herbert F. Travers, Jr., U. S. Atty., was on brief, for appellee.

vilian work at Massachusetts General Hospital. Because of procedural irregularities, two further orders were issued, and twice more defendant refused to report. He was then indicted and convicted after a trial by jury.

On this appeal, defendant raises three objections: first, that the requirement of alternate service for conscientious objectors infringes the free exercise of religion; second, that the trial court erred in refusing to charge that the jury should consider defendant's motivation in deciding the issue of criminal intent; and finally, that the jury should have been expressly informed of its power to acquit defendant in spite of his admitted violation of the statute.

Defendant's First Amendment claim would have us make a substantial inroad on the existing law governing military service exemptions. We rehearse briefly what that law is. It has been repeatedly recognized that exemption for military service is a matter of Congressional grace rather than constitutional compulsion. United States v. Macintosh, 283 U.S. 605, 623, 51 S.Ct. 570, 75 L.Ed. 1302 (1931); In re Summers, 325 U.S. 561, 572–573, 65 S.Ct. 1307, 89 L.Ed. 1795 (1945); Clay v. United States, 397 F.2d 901, 912 (5th Cir. 1968), vacated, 394 U.S. 310, 89 S.Ct. 1164, 22 L.Ed.2d 297 (1969), and cases cited. Since Congress can require everyone to submit to military discipline, the argument goes, it can also condition the grant of exemption on the performance of a less burdensome form of service. George v. United States, 196 F.2d 445, 450 (9th Cir.), cert. denied, 344 U.S. 843, 73 S. Ct. 58, 97 L.Ed. 656 (1952); Kramer v. United States, 147 F.2d 756, 760 (6th Cir.), cert. denied, 324 U.S. 878, 65 S. Ct. 1026, 89 L.Ed. 1429 (1945), and cases cited.

■■ We need not decide whether to adopt this approach, however, for even if we assume that the First Amendment requires some form of exemption for those conscientiously opposed to military service, it does not follow that Congress must grant a total exemption. Congress has broad power to take all steps necessary and appropriate to raising and supporting an army. United States v. O'Brien, 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). In exercising this power, Congress may legitimately require alternate service to alleviate the unfairness which results if conscientious objectors continue to enjoy the fruits of civilian life while their fellow citizens are conscripted for onerous and sometimes hazardous duty. Cf. Braunfeld v. Brown, 366 U.S. 599, 608, 609, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961). Congress may also require alternate service to avoid the difficulties implicit in granting a total exemption based on individual belief, such as the potential threat to the morale of the armed forces Howze v. United States, 272 F.2d 146, 148 (9th Cir. 1959), or the problem of distinguishing self-serving claims from beliefs which deserve the title "conscientious". Weightman v. United States, 142 F.2d 188, 191, 192 (1st Cir. 1944).

Defendant impliedly rejects this conventional wisdom. The First Amendment, he argues, protects religiously motivated conduct unless that conduct poses some substantial peril to the public health or safety. This stringent test, he maintains, should be applied even if the individual's objection is not to the conduct which the government seeks to compel, but to the national policy which that conduct promotes. Counsel for defendant made clear at oral argument that this principle would equally apply to one who refused to pay his income tax because of conscientious objections to the war in Vietnam.

■ Such a view of the First Amendment is, we think, overly solipsistic. The Constitution does not extend the same degree of protection to every manifestation of religious impulse. The strict standard which defendant invokes may be appropriate when the government seeks

to regulate acts of worship,[1] or to compel conduct which violates a cardinal tenet of religious faith.[2] In this case, however, defendant has been ordered to work in a hospital, an employment in which he has already engaged without violence to his principles.[3] Defendant objects not to the specific conduct which the government requires, but to cooperation with a system which he considers wicked. But, in the words of Mr. Justice Cardozo,

> "Never in our history has the notion been accepted * * * that acts thus indirectly related to service in the camp or field are so tied to the practice of religion as to be exempt, in law or in morals, from regulation by the state. * * * [A] different doctrine would carry us to lengths that have never yet been dreamed of. The conscientious objector, if his liberties were to be thus extended, might refuse to contribute taxes in furtherance of a war, whether for attack or for defense, or in furtherance of any other end condemned by his conscience as irreligious or immoral. The right of private judgment has never yet been so exalted above the powers and the compulsion of the agencies of government." Hamilton v. Board of Regents, 293 U.S. 245, 267, 268, 55 S.Ct. 197, 206, 79 L.Ed. 343 (1934) (concurring).

Defendant nevertheless argues that even if the First Amendment does not immunize his conduct from regulation, at least the government should have the burden of showing that no less restrictive form of regulation could accomplish its purposes, citing Sherbert

v. Verner, 374 U.S. at 407, 83 S.Ct. 1790. In *Sherbert,* however, the action of the state imposed a burden on the observance of the Sabbath, a practice which obviously is a cardinal element in the exercise of a religion. Moreover, in *Sherbert,* the state had made no effort to accommodate the religious practice in question. In this case, by contrast, Congress has deferred to the demands of conscience by requiring conscientious objectors to perform alternate service rather than submit to induction. Perhaps there are other ways in which Congress could have struck the balance between conscience and the needs of the Selective Service System, but at some point courts must defer to the Congressional judgment concerning what is necessary and appropriate. McCulloch v. Maryland, 17 U.S. (4 Wheaton) 316, 4 L.Ed. 579 (1819). We think that point has been reached here.

Defendant's second attack focuses on the trial court's instructions concerning the mental element of the offense charged. The court told the jury that the term "willfully" as used in the indictment meant that the defendant acted with knowledge that his conduct was prohibited by law and with specific intent to violate the law. The court then distinguished "motive" and "intent":

> "Motive is that which tempts, induces or moves a person to commit a crime. Intent is the purpose or mental state with which the person does the act. Now, members of the jury, motive, no matter how laudable or praiseworthy that motive may be, cannot negative a specificate intent to commit a crime. * * * Where a person has a specific

---

1. *E. g.,* People v. Woody, 61 Cal.2d 716, 40 Cal.Rptr. 69, 394 P.2d 813 (1964) (regulation of peyote used in religious ritual).

2. Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) (denial of unemployment compensation to Sabbatarians); In re Jenison, 267 Minn. 136, 125 N.W.2d 588, 2 A.L.R.3d 1389 (1963) (compulsory jury duty); United States v. Sisson, 297 F.Supp. 902 (D.Mass.1969), review granted, 396 U.S. 812, 90 S.Ct. 92, 24 L.Ed.2d 65 (Oct. 14, 1969) (com-

pulsory military service). For a discussion identifying the variables to be assessed, see Gianella, Religious Liberty, Nonestablishment, and Doctrinal Development —Part I. The Religious Liberty Guarantee, 80 Harv.L.Rev. 1381, 1390, 1411–1413 (1967).

3. Defendant's SSS Form 152 indicates that he has worked at three different hospitals as a scrub nurse, lab technician, and research assistant.

intent to bring about a result which the law seeks to prevent, what induces him to act, his motive, is immaterial." In keeping with this instruction, the trial court rebuffed all attempts by defense counsel to demonstrate defendant's good moral character or to explore the reasonableness of defendant's beliefs concerning the draft and the war in Vietnam.

Defendant criticizes these rulings on the ground that the term "willfully" as used in the indictment includes not only an intent to violate the statute, but also a venal or ignoble motive. Two arguments support this proposition: first, defendant maintains that criminal liability in general requires the "concurrence of an evil-meaning mind with an evil-doing hand";[4] second, defendant argues that a good faith belief in the unconstitutionality of government action excuses otherwise criminal conduct.

Defendant's first argument attempts to transform occasionally pertinent language into black letter law. Defendant cites a miscellany of cases which use the phrase "bad purpose" in describing the mental element necessary for criminal culpability. In context, this phrase serves as a convenient shorthand expression to distinguish liability based on conscious wrong-doing from liability based on mere carelessness or mistake. But the occasional use of this phrase does not establish that an ignoble motive is a necessary element of crime. The cases on which defendant places primary reliance hold only that, as a matter of history and statutory construction, certain crimes require a specific mental element. Spies v. United States, 317 U.S. 492, 498, 499, 63 S.Ct. 364, 87 L.Ed. 418 (1943); Screws v. United States, 325 U.S. 91, 96, 101, 65 S.Ct. 1031, 89 L.Ed.

1495 (1945); Morissette v. United States, 342 U.S. 246, 260–263, 72 S.Ct. 240 (1952).

■ The trial court's charge in this case properly explained the mental element required for conviction under 50 U.S.C. App. § 462. To sustain conviction under this statute, the government must show awareness of legal obligation and a deliberate purpose not to comply. United States v. Rabb, 394 F.2d 230, 233 (3d Cir. 1968). Evidence concerning defendant's good moral character or the reasonableness of his political beliefs does not bear on whether he knowingly and deliberately failed to report for alternate service. Harris v. United States, 412 F.2d 384, 388 (9th Cir. 1969); United States v. Sisson, 294 F.Supp. 515, 519 (D.Mass.1968).[5]

■ Defendant also maintains that his conduct, "based upon the bona fide belief in the illegality of the Government's conduct or based upon constitutional claims * * * cannot be the basis of a criminal conviction." For this he relies principally on United States v. Murdock, 290 U.S. 389, 54 S.Ct. 223, 78 L.Ed. 381 (1933), and Keegan v. United States, 325 U.S. 478, 65 S.Ct. 1203, 89 L.Ed. 1745 (1945), with mention of Keegan's offspring, Okamoto v. United States, 152 F.2d 905 (10th Cir. 1945). These cases have elsewhere been cited to us in support of the same proposition.[6] Their meaning is elusive, but our study leads us to conclude that *Murdock* and *Keegan* are not the twin pillars of the broad doctrine which defendant advances, but are addressed to two quite separate problems.

*Murdock* was a prosecution under the revenue laws. The defendant had refused to give tax information to the federal government on the grounds that dis-

4. Morissette v. United States, 342 U.S. 246, 251, 72 S.Ct. 240, 244, 96 L.Ed. 288 (1952).

5. Defendant repeatedly cites *Sisson* to justify admitting evidence concerning the reasonableness of defendant's belief. The court did consider such evidence in *Sisson*, but only on the issue of the constitutional-

ity of distinguishing between religious and ethical objections to war. The court specifically ruled that such evidence was irrelevant to the issue of intent. United States v. Sisson, *supra*, 294 F.Supp. at 519.

6. *See* United States v. Spock, 416 F.2d 165, 178, n. 29 (1st Cir. 1969).

closure would expose him to state prosecutions in violation of the Fifth Amendment. After lengthy litigation, the Supreme Court rejected defendant's Fifth Amendment claim,[7] but the Court later held that defendant's reason for refusal was relevant to the issue of willfulness and should have been considered by the jury. The Court reached this result by a process of statutory construction. Under a complex regulatory scheme such as the revenue laws, honest disagreements about the meaning of the law will often arise. Congress, reasoned the Court, did not intend one to become a criminal "by reason of a bona-fide misunderstanding" as to his duty. 290 U.S. at 396, 54 S.Ct. at 226. *Murdock* does not, therefore, stand for the broad proposition that one who bases his action on constitutional claims is immune from prosecution. Braden v. United States, 365 U.S. 431, 437, 438, 81 S.Ct. 584, 5 L.Ed.2d 653 (1961). Rather, *Murdock* holds that Congress intended to impose the criminal sanctions of the revenue laws only for intentional evasions, not for mistakes or misunderstandings. United States v. Martell, 199 F.2d 670, 672 (3d Cir. 1952), cert. denied, 345 U.S. 917, 73 S.Ct. 728, 97 L.Ed. 1350 (1953).[8]

In the case at bar, however, there was no misunderstanding of what the law required, and the power of Congress to impose such requirements has long been settled. Defendant disobeyed a well-settled requirement in order to protest the entire conscription system, and hopefully to make new law, but that does not give him immunity from the sanctions of the old law if he is unsuccessful in his efforts. Had the defendant in *Mur-*

*dock* refused to divulge tax information because he conscientiously felt that the capital gains provisions were immoral or that deficit spending was contrary to Scripture, he would have fared no better. Congress may not have intended to punish good-faith misunderstanding, but Congress obviously did not intend to carve out a universal exception for test-cases.

*Keegan* does not, we think, enlarge the scope of *Murdock*, but is addressed to a different problem. There the defendants were prosecuted for conspiracy to counsel draft evasion, there being at that time no sanction for counselling refusal to serve. The majority viewed the evidence as limited to counselling refusal to serve.[9] In this context, Mr. Justice Roberts added a cryptic and ambiguous dictum:

> "One with innocent motives, who honestly believes a law unconstitutional and, therefore, not obligatory, may well counsel that the law shall not be obeyed; that its command shall be resisted until a court shall have held it valid, but this is not knowingly counselling, stealthily and by guile, to evade its command. * * *" 325 U.S. at 493–494, 65 S.Ct. at 1209.

We construe this as describing the conduct of the defendants and contrasting it with evasion, not—as has been the interpretation of some—as proclaiming a novel doctrine that one may with impunity counsel or engage in disobedience of a squarely applicable law in order to provoke a test case. We are strengthened in this reading not only by the ambiguity and brevity of the quoted passage, but by the concurrence on separate grounds of

---

7. United States v. Murdock, 284 U.S. 141, 52 S.Ct. 63, 76 L.Ed. 210 (1931). *Murdock's* interpretation of the Fifth Amendment was overruled in Murphy v. Waterfront Commission, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964).

8. We do not, of course, mean to confine *Murdock* solely to the Internal Revenue Code. Similar logic may be applied in other cases where Congress penalizes only "willful" violations of complex regulations. *E. g.,* Rainbow Dyeing & Cleaning

Co. v. Bowles, 80 U.S.App.D.C. 137, 150 F.2d 273, 279 (1945). This limited rule of statutory construction, however, falls far short of the sweeping principle which defendant advocates.

9. Defendants, officers of the German-American Bund, had ordered Bund members to register for the draft but to refuse service because of an amendment to the selective service law which proscribed filling any draft-created job vacancy with a Bund member.

two Justices and the specific rejection of the test-case-in-good-faith doctrine by four dissenters.[10] *Okamoto,* it is true, seized on the dictum and gave it broad reach. We would agree with the result, but only for the reasons advanced by the dissent, namely, this was *Keegan* replayed. Subsequent progeny have been few and conflicting.[11]

■ Defendant's final objection concerns the trial court's refusal to instruct the jury that it had the power to acquit defendant even though he was guilty of the offense charged. The court's refusal was clearly correct. The doctrine that juries are judges of the law as well as the facts in criminal cases has enjoyed a rich and varied history, but this doctrine was decisively rejected during the nineteenth century. Howe, Juries as Judges of Criminal Law, 52 Harv.L.Rev. 582 (1939). Today jurors may have the power to ignore the law, but their duty is to apply the law as interpreted by the court, and they should be so instructed. Sparf & Hansen v. United States, 156 U.S. 51, 15 S.Ct. 273, 39 L.Ed. 343 (1895). Our holding in United States v. Spock, 416 F.2d 165 (1st Cir. 1969), that judges could not "catechize" criminal juries through the use of special questions was meant to preserve the existing balance between judge and jury, not to break new ground. There have been recent suggestions that a broader role for the jury would be desirable in some cases. Professor Freund, for example, has suggested that "There ought to be some new doctrine which would permit a judge to tell a jury that they were to decide in the light of all the circumstances" in cases involving "people who

act in a measured way for reasons of conscience. * * *" New York Times, Sept. 19, 1968. Whatever the merits of this aspiration, the task of determining the desirability, feasibility, and lineaments of such a new doctrine is not for us.

Affirmed.

---

10. We note also that both *Keegan* and *Murdock* were from the pen of Mr. Justice Roberts, but neither he nor the writers of the three other opinions in *Keegan* made reference to *Murdock.*

11. The 10th Circuit has limited *Okamoto* to cases of counselling disobedience as distinguished from actual violations of the terms of a statute. Warren v. United States, 177 F.2d 596, 600 (10th Cir.

1949), cert. denied, 338 U.S. 947, 70 S.Ct. 485, 94 L.Ed. 584 (1950); *see also* Brooks v. Auburn University, 296 F.Supp. 188, 195 (M.D.Ala.1969) (dictum). *Keegan* and *Okamoto* have also been read as bearing on the intent necessary to prove a criminal conspiracy. Holdridge v. United States, 282 F.2d 302, 310–311 (8th Cir. 1960); *contra,* Lantis v. United States, 186 F.2d 91, 92–93 (9th Cir. 1950).